NATHAN D. RECTANUS
Wyo. Bar. No. 7-5284
LUBING LAW GROUP, LLC
P.O. Box 3894
Jackson, WY 83001
Phone: (307) 733-7242
Fax: (307) 733-7471
nate@lubinglawgroup.com

**FILED**

10:35 am, 4/20/20

**Margaret Botkins
Clerk of Court**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| WESTERN WATERSHEDS PROJECT<br>126 S. Main St., Ste. B2<br>Hailey, ID 83333, | ) ) ) ) | |
| SIERRA CLUB<br>2101 Webster St., Ste. 1300<br>Oakland, CA 94612, | ) ) ) ) | |
| WYOMING WILDLIFE ADVOCATES<br>1650 Prosperity Lane,<br>Wilson, WY 83014, | ) ) ) ) | |
| and | ) ) | |
| GALLATIN WILDLIFE ASSOCIATION<br>745 Doane Rd.<br>Bozeman, MT 59718, | ) ) ) ) | |
| _Petitioners_, | ) ) | Civ. No.  20-CV-67-NDF |
| v. | ) ) ) | |
| VICKI CHRISTIANSEN, Chief,<br>U.S. Forest Service<br>1400 Independence Ave., SW<br>Washington, DC 20250, | ) ) ) ) ) | |
| and | ) ) | |
| SONNY PERDUE, Secretary of Agriculture,<br>U.S. Department of Agriculture<br>1400 Independence Ave., SW<br>Washington, DC 20250, | ) ) ) ) | |

1

)
*Respondents*.                            )

---

**PETITION FOR REVIEW OF AGENCY ACTION**

---

## INTRODUCTION

1.      This action challenges the United States Forest Service's ("USFS") decision to reauthorize the widely criticized practice of "artificial feeding" of wild elk on three separate feedgrounds on National Forest System ("NFS") lands within the Bridger-Teton National Forest ("BTNF"). Specifically, this action challenges two feedground decisions by the USFS: (1) the agency's five-year approval of the Wyoming Game and Fish Commission's ("WGFC") request to resume feeding operations at Alkali Creek Feedground without first conducting the environmental analysis previously ordered by this Court; and (2) the agency's indefinite authorization of artificial feeding at Dell Creek and Forest Park feedgrounds without issuing the requisite special use permit under USFS's own regulations, 36 C.F.R. § 251.54(1)(e), or conducting any environmental analysis whatsoever under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347.

2.      The feedgrounds at issue are used to artificially attract and feed the region's wild elk with hay, rather than allowing the elk to disperse on the landscape to locations where natural forage is available. The 3.4 million-acre BTNF comprises a large part of the Greater Yellowstone Ecosystem ("GYE")—the largest remaining intact ecosystem in the lower forty-eight states. The BTNF is adjacent to Grand Teton National Park ("GTNP") and the National Elk Refuge ("NER"), and together with these ecologically and culturally significant public lands, sustains

populations of iconic wildlife species such as elk, bison, and grizzly bears that contribute to the ecological integrity of the GYE.

3.      Through the agency actions challenged herein, USFS has decided to perpetuate the artificial feeding of elk at Alkali Creek, Forest Park, and Dell Creek feedgrounds rather than abandoning—or at least phasing out—a practice that this and other courts have found to be outdated and environmentally damaging. Artificial winter feeding creates unnaturally dense concentrations of elk, causing deleterious impacts to elk and the surrounding environment. Continued feeding at these feedgrounds is highly likely to cause or contribute to an outbreak of lethal chronic wasting disease ("CWD"), the equivalent of "mad cow" disease in deer and elk, or other diseases, which would devastate elk populations and cause cascading impacts to the function and stability of the GYE.

4.      Notably, a significant portion of western Wyoming's elk are concentrated at feedgrounds on the NER during the winter. To the south and east of the NER there are regions where CWD is endemic; the feedgrounds at issue here are situated between these CWD endemic areas and the NER. Some of the area's elk are known to share seasonal ranges during the year and travel among different feedgrounds and the NER. Moreover, large herds of Wyoming's migratory mule deer travel annually from CWD-endemic zones through areas surrounding the feedgrounds at issue to the NER, acting as significant vectors of CWD transmission in the process. The presence of a single infected elk (or deer) at the Dell Creek, Forest Park, or Alkali Creek feedgrounds could, therefore, introduce this deadly disease to the NER, thereby transmitting it to a significant majority of western Wyoming's elk herds. Because CWD remains persistent in the environment after the host has died, the GYE would be permanently

contaminated with the disease after it is introduced and it would have devastating population-level consequences.

5.      In the first permit (or lack thereof) challenged here, USFS authorized artificial feeding of wild elk at Forest Park and Dell Creek feedgrounds for an indefinite time period. Previously, these feedgrounds had been operated under long-term special use permits that both expired on December 31, 2016. Thereafter, USFS issued a one-year special use permit authorizing artificial feeding at both feedgrounds, which expired on December 31, 2017. On December 19, 2017, without issuing any special use permit or conducting any environmental analysis, USFS notified WGFC via letter that it was authorized to continue winter feeding at both feedgrounds for an unspecified duration, which would ostensibly allow USFS "to complete the appropriate level of environmental analysis and comply with other regulatory and procedural requirements." To date, however, no such analysis has occurred and no timetable for compliance been provided. All the while, CWD has continued to spread across Wyoming and artificial feeding has continued at both Forest Park and Dell Creek feedgrounds during the intervening feeding seasons.

6.      The second permit challenged herein concerns the Alkali Creek Feedground, which has previously been the subject of litigation between the parties before this Court. In that case, the Court set aside USFS's permit—which had allowed WGFC to conduct artificial feeding at Alkali Creek until 2028—on grounds that USFS had failed to comply with NEPA. As a result, the Court remanded the permit to the agency with instructions to rectify the deficiencies noted in its Order. Rather than conduct that Court-ordered analysis, however, USFS recently categorically excluded from NEPA review essentially the same program at Alkali Creek Feedground for a minimum of five years, without setting forth any binding commitments or even a timeline for

eliminating or phasing out artificial feeding at this feedground. Although USFS alleges that its reauthorization at Alkali Creek is only intended for "emergencies" and aims to ultimately phase out the practice of artificial feeding at this particular feedground, the vague and arbitrary "emergency" triggers, coupled with the lack of any commitment to actually ending the practice, makes clear that USFS intends to change little and instead merely seeks to avoid taking a hard look at the environmental impacts associated with WGFC's artificial feeding program on federal land.

7.       Although USFS's decisions to reauthorize extensive artificial feeding operations in the BTNF are deficient in their own right, they are even more arbitrary when considered in conjunction with the National Park Service ("NPS") and the Fish and Wildlife Service's ("FWS") joint decision to phase out artificial feeding on the NER, which is adjacent to the BTNF. In the 2007 Final Bison and Elk Management Plan and Environmental Impact Statement ("2007 BEMP"), issued jointly by those two agencies, NPS and FWS committed to ending the practice of artificial feeding on the NER based on the widely accepted view in the scientific community that the indefinite operation of feedgrounds constitutes an unacceptable risk to the elk herd, other wildlife, and the surrounding environment. This view has been endorsed by the D.C. Circuit, which upheld the 2007 BEMP only because the federal agencies committed to bringing the admittedly deleterious practice to an end over time. *See Defs. of Wildlife v. Salazar*, 651 F.3d 112, 117 (D.C. Cir. 2011). However, in its recent reauthorizations at Alkali Creek, Dell Creek, and Forest Park feedgrounds, USFS has entirely failed to consider how its decision will affect the goals of the 2007 BEMP or the recently published 2019 Bison and Elk Step-Down Plan, which purports to implement the 2007 BEMP.

8.      For these reasons, Respondents have acted in a manner that is "arbitrary and capricious, an abuse of discretion," "otherwise not in accordance with law," and "without observance of procedure required by law," within the meaning of the judicial review provision of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2). Accordingly, USFS's decisions to reauthorize artificial feeding at Alkali Creek, Dell Creek, and Forest Park should be set aside. *Id*.

## JURISDICTION

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question).

## PARTIES

10.     Petitioner Western Watersheds Project ("WWP") is a nonprofit corporation with over 5,000 members and supporters, and field offices in several western states, including Wyoming. WWP is dedicated to protecting and restoring watersheds and wildlife in the American West through education, public policy initiatives, and legal advocacy. WWP and its members have longstanding interests in improving public lands management throughout the western United States.

11.     Petitioner Sierra Club is a nonprofit corporation with approximately 796,000 members in chapters and groups in all 50 states. Sierra Club's mission is to explore, enjoy, and protect the wild places of the earth and to educate and enlist humanity to protect and restore the quality of the natural and human environment. Sierra Club and its members are actively involved in species and habitat protection on public land throughout the country.

12.     Petitioner Wyoming Wildlife Advocates ("WWA") is a nonprofit corporation based in Wilson, Wyoming. WWA works to promote science-based wildlife management that fosters ecosystem health and a natural balance between species in the state of Wyoming. Since

its inception, WWA has had an interest in protecting Wyoming wildlife and promoting public

awareness and understanding of regional wildlife issues. WWA and its staff actively participate

in the conservation of wildlife species in the BTNF and the GYE by submitting comments on

state and federal land and wildlife management plans and decisions, and by participating in other

public engagement opportunities surrounding those decisions. WWA promotes public awareness

and understanding of regional wildlife issues through its newsletter and social media.

13.     Petitioner Gallatin Wildlife Association ("GWA") is a nonprofit volunteer

wildlife organization of approximately 50 members. Headquartered in Montana, GWA is

composed of dedicated hunters, anglers, and other wildlife advocates in southwest Montana and

beyond. GWA's mission is to protect habitat and conserve fish and wildlife for this and future

generations. GWA has longstanding interests in supporting the sustainable management of fish

and wildlife populations through fair chase public hunting and fishing opportunities that will

ensure these traditions are passed on for future generations to enjoy.

14.     Members of WWP, Sierra Club, WWA, and the GWA regularly visit and will

continue to visit the BTNF (including areas around the Dell Creek, Forest Park, and Alkali Creek

feedgrounds), the NER, GTNP, and other areas within the GYE to observe and otherwise benefit

from the elk population, native landscapes, and unspoiled ecological processes. Petitioners'

members and staff members enjoy activities on these public lands, including hiking, wildlife

viewing, wildlife photography, and aesthetic enjoyment. Members of each of the Petitioner

organizations have demonstrated interests in the preservation and protection of elk and other

wildlife in the BTNF and GYE, and actively work to conserve the natural ecosystems and restore

them to their natural splendor. USFS's recent authorizations of feeding operations at Dell Creek,

Forest Park, and Alkali Creek feedgrounds will perpetuate unnaturally high densities of elk on

and around those feedgrounds, which will result in adverse local and regional environmental impacts, as well as unnatural wildlife behaviors, and will fuel the introduction and spread of incurable, fatal wildlife diseases, resulting in significant and deleterious ecosystem-wide impacts that jeopardize the interests of Petitioner organizations' members.

15.     The legal violations alleged in this Petition, traceable directly to Respondents' conduct, cause concrete injury to the aesthetic, conservation, recreational, scientific, educational, and wildlife preservation interests of the members of the Petitioner organizations, including by adversely affecting the behavior of the elk and other wildlife that Petitioners enjoy observing and otherwise benefit from, and by creating an enormous risk of disease transmission in the elk and other wildlife populations that Petitioners enjoy and otherwise benefit from. These actual, concrete interests of Petitioner organizations' members have been, are currently being, and, absent relief from this Court, will continue to be adversely and irreversibly injured by Respondents' failure to comply with federal law. Relief from this Court, including vacatur of the challenged decisions pending full compliance with NEPA and other legal requirements, will remedy Petitioners' injuries.

16.     Respondent Vicki Christiansen is the Chief of USFS and is directly responsible for the supervision, management, and control of the units of the NFS, including the BTNF. Accordingly, she is responsible for overseeing USFS's decision challenged in this action and is sued solely in her official capacity.

17.     Respondent Sonny Perdue is the Secretary of Agriculture and is ultimately responsible for overseeing the work of USFS, an agency within the Department of Agriculture. He is sued solely in his official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### A.      The National Environmental Policy Act

18.      NEPA is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its purposes are to "help public officials make decisions that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment," and to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* § 1500.1(b)–(c).

19.      The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA, *see* 40 C.F.R. §§ 1500–1508, which are "binding on all federal agencies." *Id.* § 1500.3.

20.      Under NEPA, federal agencies are required to consider the potential environmental impact of *all* agency actions. 42 U.S.C. §§ 4321–4347. Agency action generally requires the preparation of an Environmental Assessment ("EA"), *see* 40 C.F.R. § 1508.9, an Environmental Impact Statement ("EIS"), *see id.* § 1502.9, or both. For "major Federal action[s] significantly impacting the quality of the human environment," NEPA requires federal agencies to prepare an EIS. 42 U.S.C. § 4332(c). In circumstances where the significance of the proposed project is uncertain, CEQ regulations authorize federal agencies to prepare an EA in order to evaluate whether an EIS is required. 40 C.F.R. §§ 1501.3, 1508.9.

21.      CEQ regulations also authorize federal agencies to identify categories of actions that under normal circumstances do not have a significant environmental impact, either individually or cumulatively; such actions may then be established as "categorical exclusions," and agencies are not required to prepare an EA or an EIS when undertaking those actions

because they are excluded—as a category of actions with insignificant impacts—from NEPA review. *Id.* § 1507.3(b); *id.* § 1508.4; *see also* 36 C.F.R. § 220.6 (USFS regulations governing categorical exclusions under NEPA).

22.     Categorical exclusions may only be invoked for "actions which do not individually or cumulatively have a significant effect on the human environment . . . ." 40 C.F.R. § 1508.4; *accord* U.S. Forest Service Handbook - 1909.15 ("NEPA Handbook") § 30.0 (2020). To determine whether an action will have "a significant effect on the environment," an agency must invite public input through a process known as "scoping." 36 C.F.R. § 220.6(c); 40 C.F.R. § 1501.7. As explained by USFS's NEPA Handbook, "[s]coping is important to discover information that could point to the need for an EA or EIS versus a CE," including "the presence or absence of any extraordinary circumstances that would warrant further documentation in an EA or EIS." NEPA Handbook § 31.3. "Scoping is required for *all* Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS." 36 C.F.R. § 220.4(e)(1) (emphasis added).

23.     When appropriately established and applied, categorical exclusions allow federal agencies to expedite the environmental review process for proposals that typically do not require more resource-intensive EAs or EISs. However, any procedures addressing categorical exclusions "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. The presence of "extraordinary circumstances" for a particular permit decision requires the preparation of either an EIS or an EA. *Id.* § 1501.4.

24.     Agencies have an independent obligation to ensure that extraordinary circumstances do not exist prior to issuing a categorical exclusion. NEPA Handbook § 31.2.

10

USFS's NEPA regulations provide a list of "[r]esource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS." 36 C.F.R. § 220.6(b). Those conditions include: (i) "Federally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species"; (ii) "Flood plains, wetlands, or municipal watersheds"; (iii) "Congressionally designated areas, such as wilderness, wilderness study areas, or national recreation areas"; (iv) "Inventoried roadless area or potential wilderness area"; (v) "Research natural areas"; (vi) "American Indians and Alaska Native religious or cultural sites"; and (vii) "Archaeological sites, or historic properties or areas." *Id.*

25.     USFS's NEPA regulations provide that "[t]he mere presence of one or more of these resource conditions does not preclude use of a [CE]"; instead, the relevant consideration "is the existence of a cause-effect relationship between a proposed action and the potential effect on these resource conditions, and if such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id.* USFS's NEPA Handbook further explains that where "the degree of potential effect raises uncertainty over its significance, then an extraordinary circumstance exists, precluding use of a categorical exclusion." NEPA Handbook § 31.2.

**B.     The National Forest Management Act, and the Multiple-Use and Sustainable Yield Act**

26.     In enacting the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 472a, 521b, 1600-1614, and the Multiple-Use and Sustained Yield Act ("MUSYA"), *id.* §§ 528-531, Congress set forth factors that USFS must consider when administering the NFS and its resources. When issuing site-specific management decisions, USFS must take into account its

statutory obligations to: provide for healthy and diverse forest ecosystems; ensure the sustained yield of forest resources, including wildlife; and balance environmental and commercial considerations. *Id.* §§ 528, 529, 1604(g)(3)(B).

27.     NFMA and its regulations require USFS to develop and implement land and resource management plans for units of the National Forest System. 16 U.S.C. § 1604(a). The plans must reflect the agency's consideration of its statutory mandates to develop and administer the national forests to secure water flows and provide a continuous supply of timber, and provide for a "diversity of plant and animal communities based on the suitability and capability" of the specific forest unit to enable the agency to meet its multiple-use objectives. *Id.* § 1604(g)(3)(B).

28.     The MUSYA further provides that in managing NFS land and resources, USFS must: balance the competing uses for outdoor recreation, range, timber, watershed, and wildlife and fish purposes; and provide for multiple use and sustained yield of the various products and services obtained from the National Forest lands. 16 U.S.C. §§ 475, 528, 529.

29.     Pursuant to the MUSYA, USFS has promulgated regulations governing special use permits, which authorize the "use or occupancy of [NFS] lands and specif[y] the terms and conditions under which the use or occupancy may occur." 36 C.F.R. § 251.51. "All uses of [NFS] lands, improvements, and resources, except those" enumerated under USFS regulations "are designated 'special uses.'" *Id.* § 251.50(a).

30.     USFS's special use regulations provide minimum requirements that each applicant must meet. 36 C.F.R. § 251.54. Specifically, USFS must ensure that: "the proposed use is consistent with" applicable federal "laws, regulations, orders, and policies," including NFMA, the MUSYA, and statutes establishing and governing national forests, and "with applicable State and local health and sanitation laws"; "[t]he proposed use is consistent or can be made consistent

with standards and guidelines in the applicable [forest management plan]"; and "[t]he proposed use will not pose a serious or substantial risk to public health or safety." *Id.* § 251.54(e)(1)(i)–(iii). Assuming an application for a special use permit satisfies these threshold criteria, USFS is nevertheless required to "reject any proposal" for a special use permit that "would be inconsistent or incompatible with the purposes for which the lands are managed," or "would not be in the public interest." *Id.* § 251.54(e)(5)(i)–(ii).

31.     USFS regulations governing special use permits further provide that "Federal, State, and local government agencies and the public *shall* receive adequate notice and an opportunity to comment upon a special use proposal accepted as a formal application in accordance with [USFS] NEPA procedures." 36 C.F.R. § 251.54(g)(2)(ii) (emphasis added).

### C.     The Administrative Procedure Act

32.     Under the APA, a reviewing court "shall" set aside agency actions, findings, or conclusions when they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or when they are adopted "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D). An agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency's decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfr. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

33.     When reviewing agency action under the APA, the court must ensure that the agency reviewed the relevant data and articulated a satisfactory explanation establishing a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

The agency's failure to do so renders its decision arbitrary and capricious. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989).

## FACTUAL BACKGROUND

**A.     Greater Yellowstone Ecosystem Elk, Artificial Feeding, and the National Elk Refuge's Planned Feeding Phase-Out**

34.     The elk found in the GYE comprise one of the largest concentrations of elk in North America. The region's elk herds feature prominently in its history, culture, and economy. The artificial feeding of elk began in the early 1900s in response to high winter mortality. The practice has continued on federal lands in the BTNF and in the neighboring NER, and has consistently been referred to as a "program" by the responsible federal and state agencies.

35.     Today, the artificial feeding program is primarily driven by a desire to prevent elk from entering private lands and feeding on privately-owned haystack yards and also to prevent the transmission of infectious diseases, such as CWD and brucellosis, to livestock. According to the Department of the Interior—the parent agency for both NPS and the FWS, the agencies responsible for managing the elk populations in the GTNP and NER—artificial feeding leads to a seasonal concentration of elk and bison which is "an unnatural situation that has contributed to . . . an increased risk of potentially major outbreaks of exotic diseases," including CWD, and "damage to and loss of habitat." 2007 BEMP at vi. However, despite the widely accepted knowledge that artificial feeding causes significant problems for wildlife in the GYE—which includes the BTNF—USFS continues to authorize the practice on NFS lands.

36.     Recognizing the disease and other risks inherent in continuing to concentrate large numbers of elk on feedgrounds, in 2007, the NPS and the FWS jointly issued the 2007 BEMP, which called for an increase in forage production and an eventual phase-out of artificial feeding on the NER.

14

37.     The 2007 BEMP was challenged in the U.S. District Court for the District of

Columbia by conservationists for failure to specify a time certain for ending the harmful practice

of artificial feeding. *See Defs. of Wildlife v. Salazar*, 698 F. Supp. 2d 141 (D.D.C. 2010), *aff'd*

651 F.3d 112 (2011). Although the plan was ultimately upheld, both the District Court and the

U.S. Court of Appeals for the District of Columbia Circuit strongly suggested that it would be

arbitrary and capricious for the NPS and the FWS to "categorically refuse[] to phase out the

winter feeding program [on the NER] in spite of all the evidence in the record about the dangers

of [artificial] feeding." 698 F. Supp. 2d at 148; 651 F.3d at 117.

38.     On December 31, 2019, FWS finally released its long-awaited Bison and Elk

Management Step-Down Plan, which asserts that it "provide[s] a path for progressively

transitioning from winter feeding of elk and bison on the NER to greater reliance on freestanding

forage," with implementation of the plan set to begin in the winter of 2020. FWS, Bison and Elk

Management Step-Down Plan at ix, xii (Dec. 2019) ("2019 Step-Down Plan").

**B.     Chronic Wasting Disease Within Concentrated Elk Populations**

39.     CWD is a chronic, fatal disease that affects the central nervous system of

ungulates, including elk, white-tailed and mule deer, and moose. CWD is a transmissible

spongiform encephalopathy ("TSE") caused by an abnormal, non-living prion protein. Its effects

on infected individuals are devastating; the onset of disease is slow, and those infected

"experience progressive loss of body condition, reluctance to move unless approached closely,

increased drinking, depression, and eventually death." USFS, Chronic Wasting Disease

Literature Review Technical Report ("CWD Report"), at 2 (June 2014).[1] All animals that present

---

[1] The CWD Report was originally included as Appendix 7 to USFS's *Final Supplement to the Environmental Impact Statement Long Term Special Use Authorization for the Wyoming Game and Fish Commission to Use National Forest System Land for their Winter Elk Management*

with clinical signs of CWD eventually die. Although the specific mode of transmission has not been identified, evidence indicates that the disease is transmitted through contact with infected animals or carcasses, and through contact with soil, plants, or feed contaminated with the urine, feces, and/or saliva of infected animals. The long latency period (twelve to thirty-four months) allows for a substantial portion of the population to become infected before the presence of the disease is even detected. Further, recent research has shown that the infectious CWD prions "likely outlive their hosts" and persist in the environment once introduced. *Id.* at 5. Studies suggest that infectious CWD prions persist in the soil for many years, and can infect individuals that graze on infected soil. Therefore, uninfected animals are at risk of contracting CWD from the surrounding environment long after the infected individual has passed through or died. There is no known vaccine or cure for CWD; the best tools available to managers to mitigate the impacts of CWD are decreasing the concentration of elk, allowing elk and deer to spread out naturally across the landscape, and allowing natural predators to remove infected individuals, thereby reducing the potential for elk-to-elk contact between uninfected and infected individuals.

40.    Although CWD has yet to be discovered in western Wyoming's elk herds, the disease has been spreading steadily across the state in recent years. Indeed, by WGFC's own estimates, Alkali Creek Feedground is becoming surrounded by CWD endemic areas; WGFC-identified CWD endemic areas are located 15 miles due east of Alkali Creek, 10 miles due west, and 9 miles south. Similarly, moose and deer infected with CWD have been found 13 and 18

---

*Activities at Alkali Creek Feedground* ("2015 FSEIS") (Jan. 2015). Although the 2015 FSEIS was ultimately found to be deficient by this Court, *W. Watersheds Project v. Christiansen*, 348 F. Supp. 3d 1204, 1221 (D. Wyo. 2018), the findings of the CWD Report remain relevant to the instant challenge by providing context regarding the severity of CWD's spread amongst wild elk populations in Wyoming. Likewise, the 2015 FSEIS is illustrative of the context in which USFS's most recent decision regarding feeding at Alkali Creek arose.

miles from the Forest Park Feedground. Dell Creek Feedground is adjacent to a CWD endemic area to its west and northwest.

41.     The artificial congregation of elk at feedgrounds poses a distinct threat to the elk population. In fact, it is widely acknowledged by experts that "congregating elk at very high densities at feedgrounds is likely to increase the spread of disease because of an increased number and rate of potential infectious contacts with infected individuals and an infected environment." CWD Report, at 1. CWD infection rates of well over fifty percent have been documented within confined elk and deer populations.

42.     Should CWD infect western Wyoming's elk herds, its impacts on the herds themselves—and, by extension, the broader ecosystem—would be devastating. The feedgrounds at issue "could become continuous sources of disease transmission from animal to environment and back to animal." CWD Report, at 5. USFS itself has acknowledged that because CWD is easily transmitted and is likely "functionally related to ungulate density," the artificial concentration of elk at feedgrounds will contribute to the prevalence, incidence, and persistence of the disease. 2015 FSEIS at 106. While the density of free-ranging elk in western Wyoming is estimated to range, on average, from 0.26 elk/km$^2$ to 0.31 elk/km$^2$, on feedgrounds the density of elk can exceed 25,000 elk/km$^2$. CWD Report, at 10. The introduction and establishment of CWD in such an environment threatens to decimate western Wyoming's elk herds, resulting in extensive mortalities within the BTNF, the NER, and the GYE as these herds move between feedgrounds and intermingle with other wildlife populations.

C.      **The Forest Park and Dell Creek Feedgrounds**

        *1.      General Background*

43.     The Forest Park Feedground is located in the Greys River drainage, an area

WGFC has deemed a CWD endemic area. The elk frequenting the Forest Park Feedground are

considered part of the Afton elk herd unit. Prior evaluations of the Forest Park Feedground

conducted by WGFC have determined that, of the feedgrounds utilized by the Afton herd,

"Forest Park has the highest potential for phas[ing] out" artificial feeding. *See* WGFC, Afton Elk

Herd Unit (E105) Brucellosis Management Action Plan, at 5 (April 2016).

44.     The Dell Creek Feedground is located near Bondurant, Wyoming. The elk

frequenting the Dell Creek Feedground are part of the Hoback elk herd. The Hoback herd is

considered by WGFC to be an extremely dynamic herd in that elk regularly move into and out of

this herd unit, exhibiting a considerable amount of interchange with adjacent herd units.

45.     Both the Forest Park and Dell Creek feedgrounds lie along the migratory paths of

mule deer, which are significant vectors for the transmission of CWD. Herds of mule deer

regularly overwinter on CWD-endemic ranges in the southern portion of Wyoming. In the

spring, those mule deer migrate north and northwest along either side of the Wyoming Range,

passing through the vicinities of the Dell Creek and Forest Park feedgrounds, to the NER and

GTNP. Indeed, studies of radio-collared mule deer have demonstrated that members of three

different mule deer herds—the Sublette, Northern Wyoming Range, and Steamboat herds—

migrate through the areas of the Forest Park and Dell Creek feedgrounds on their way to the

NER and GTNP. Thus, a CWD outbreak at either Dell Creek or Forest Park would, through

transmission via mule deer, have devastating consequences for the health of elk located on the

NER, and for the health of the GYE as a whole.

46.     The Forest Park and Dell Creek feedgrounds have been utilized by WGFC for the artificial winter feeding of wild elk since 1979 and 1975, respectively. Historically, both feedgrounds have been operated under long-term special use permits, issued for approximately twenty years in duration. The most recent long-term special use permit for artificial feeding at Dell Creek was issued on August 2, 1996; the permit for Forest Park was issued on June 15, 1998. Both of those long-term permits expired on December 31, 2016.

47.     Although artificial feeding at the Forest Park Feedground was subjected to NEPA review in 1980, the Dell Creek Feedground has never been analyzed through any form of NEPA review. Thus, the 40-year old review of Forest Park, and the absence of any review of Dell Creek, means the impacts of CWD (which emerged as a threat much more recently than 1980) on these two feedgrounds have never been analyzed under NEPA.

48.     Artificial feeding at Dell Creek and Forest Park has been the subject of previous litigation in the Tenth Circuit. In 2006, a coalition of conservation groups challenged USFS's failure to analyze under NEPA WGFC's ongoing artificial feeding of wild elk at twelve feedgrounds on federal land, including Forest Park and Dell Creek feedgrounds. *See Greater Yellowstone Coal. v. Kimbell*, No. 06-cv-37, 2007 WL 9709798 (D. Wyo. Aug. 24, 2007), *aff'd in part and vacated in part sub nom. Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115 (10th Cir. 2009). Seeking injunctive relief, the petitioners in that case argued the rapid spread of CWD and brucellosis amongst native elk populations constituted "significant new information" that obligated USFS to reexamine (or, in the case of Dell Creek, examine in the first instance) under NEPA the practice of artificial feeding on federal land. *See id.* at *1, *7. The district court ultimately rejected petitioners' challenge, holding that the age of the feedground permits (issued between 1967 and 1996) and USFS's minimal involvement in the interim meant "[t]here [was]

19

no ongoing major federal action [] that could require supplement[al]" analysis under NEPA. *Id.* at \*9. In doing so, however, the court acknowledged that USFS's issuance of the permits in the first place may have constituted "a major federal action that . . . that was completed once the permit was issued." *Id.*

49.     On appeal, the U.S. Court of Appeals for the Tenth Circuit affirmed the district court's holding in *Kimbell* as it related to Dell Creek and Forest Park. *Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115, 1125 (10th Cir. 2009). Going beyond the district court's decision, however, the Tenth Circuit explicitly held that "the Forest Service's approval and issuance of the Forest Park permit . . . was the major federal action contemplated by NEPA." *Id.* at 1123; *see also id.* at 1125 ("This holding indicates that, as with the Forest Park permit, the major federal action was completed when the Forest Service issued the Dell Creek permit in 1996 . . . ." (citations omitted)). Thus, the Tenth Circuit effectively recognized that artificial feedgrounds' accelerating effects upon the spread of CWD are most appropriately reviewed under NEPA at the time that permits authorizing artificial feeding are issued. *See, e.g.*, *id.* at 1125.

### 2.     Recent Artificial Feeding Practices at Forest Park and Dell Creek

50.     On November 1, 2016, anticipating the December 31, 2016 expiration of the twenty-year special use permits at Forest Park and Dell Creek, Petitioners submitted preemptive comments to USFS highlighting the dangers of continued winter elk feeding at those locations. Petitioners' comments, in large part, stressed that the risk to the elk herds from CWD had increased drastically from when those feedgrounds were last permitted in the late 1990s. *See generally* Letter from Lloyd Dorsey, Conservation Director, Sierra Club Wyo. Chapter, on behalf of Petitioners, to Patricia M. O'Connor, Forest Supervisor, USFS (Nov. 1, 2016) ("2016 Letter"). Specifically, Petitioners pointed out that the Forest Park Feedground "is only 13 miles from

20

where [a] CWD-infected moose was found in 2008, and only 18 miles from where [a] CWD-infected mule deer was found in 2016." *Id.* at 5 (emphasis omitted). Likewise, Petitioners observed that the Dell Creek Feedground "is along the migratory path of mule deer from the lower Green River Basin," and that "CWD was found in mule deer in the town of Green River in 2012." *Id.* Because Dell Creek "is bracketed by CWD endemic areas 31 miles to the northeast (Deer Hunt Area 128), and 26 miles to the southwest (Deer Hunt Area 145)," and because "it is virtually assured that elk, deer and moose move from CWD endemic areas to currently non-endemic areas every year," Petitioners informed USFS that a CWD outbreak at Dell Creek was almost guaranteed if artificial feeding continued at that location. *Id.* at 5–6.

51.     Beyond highlighting the steady spread of CWD across western Wyoming, Petitioners' 2016 Letter further outlined recent scientific findings regarding the amplification effect that artificial feedgrounds have upon the spread of CWD within wild elk populations. Echoing many of USFS's own findings, Petitioners noted that the "highly efficient direct transmission of CWD among cervids" means "the number, duration, and frequency with which infectious individuals encounter susceptible ones is likely to drive early density dependent transmission of CWD." *Id.* at 4 (quoting CWD Report, at 5). Furthermore, because "feedgrounds attract elk from large catchments and congregate elk that might not otherwise contact each other," there is an elevated risk "that an infected elk from a distant locale would be the one to introduce the disease to a new herd area." *Id.* (quoting CWD Report, at 6). For these reasons, Petitioners observed that, should artificial feeding continue, "population level impacts are to be expected from the introduction and spread of CWD in elk on the Bridger-Teton National forest and nearby areas." *Id.* (quoting CWD Report, at 7).

52.     Notwithstanding the serious concerns raised by Petitioners, on November 18, 2016, USFS issued a scoping notice indicating that the agency was considering reauthorizing WGFC to continue winter feeding at both the Dell Creek and Forest Park feedgrounds for one additional year. *See* Letter to Stakeholders, from Patricia M. O'Connor, Forest Supervisor, USFS (Nov. 18, 2016) ("2016 Scoping Notice"). Although the 2016 Scoping Notice indicated that "[t]he proposed uses and conditions for the Forest Park feedground would remain identical to those [previously] permitted," it further specified that the Dell Creek permit would be expanded "from one-acre that houses the structural facilities to 35 acres to also include the associated elk feeding vicinity." 2016 Scoping Notice at 2. The uses at both feedgrounds contemplated by the 2016 Scoping Notice included: (1) "[o]perating and maintaining the feedground[s]"; (2) "[h]auling hay by truck to the feedground"; (3) "[s]upplemental feeding of up to 750 elk at Forest Park and 250 elk at Dell Creek feedground from approximately December 1 to April 30"; and (4) the "use and maintenance" of various structural facilities, including roads, fenced stackyards, hay sheds, elk traps, corrals, and cabins. 2016 Scoping Notice at 2. The 2016 Scoping Notice indicated that USFS's proposed renewal of the feedground permits "contribute[d] toward Forest Plan Goal 1.1 – 'Communities continue or gain greater prosperity' with the objective to help re-establish historic elk migration routes and to provide increased viewing and hunting opportunities for outfitters and clients." *Id.* (emphasis omitted). Finally, the 2016 Scoping Notice indicated that the permit would expire by its own terms on December 31, 2017. *Id.*

53.     On December 5, 2016, Petitioners submitted comments on USFS's 2016 Scoping Notice. Petitioners' comments reiterated many of the same concerns noted in their November 1, 2016 letter and further stressed the need for robust NEPA review of the USFS's proposed permit

renewals. *See generally* Letter from Lloyd Dorsey, Conservation Director, Sierra Club Wyo. Chapter, on behalf of Petitioners, to Patricia M. O'Connor, Forest Supervisor, USFS (Dec. 5, 2016) ("2016 Scoping Comments"). In particular, Petitioners observed that the prevalence of CWD in western Wyoming, the disease's capacity to wreak havoc on the elk herds, and the increased transmission risk associated with artificial feeding necessitate a fundamental shift in the management paradigm for wild elk on federal lands. As Petitioners noted, the continued practice of artificial feeding implicates multiple "significance" factors under NEPA's implementing regulations, 40 C.F.R. § 1508.27, meaning that "[a]n EIS is necessary at this permit issuance stage to identify significant problems, develop adequate alternatives, describe mitigations and achieve solutions in an appropriate timeframe for longstanding problems." *Id.* at 4. Petitioners, therefore, cautioned USFS against using one-year permits to shirk its obligation under NEPA to take a "hard look" at the impacts associated with reauthorizing winter feeding at Dell Creek and Forest Park. *Id.*

54. On January 3, 2017, USFS issued a two-page letter announcing its decision to reauthorize WGFC's artificial feeding program at Dell Creek and Forest Park for an additional year. USFS concluded that "[t]his one year permit [was] needed since the existing permit for this use expire[d] on December 31, 2016 and the WGFC has requested the continued use of these feedgrounds in 2017." Letter to Stakeholders from Patricia M. O'Connor, Forest Supervisor, USFS, at 1 (Jan. 3, 2017) ("2017 Permit"). Rather than conduct the environmental review called for by Petitioners, USFS summarily concluded that the permits were categorically excluded from NEPA review under the agency's implementing regulations, 36 C.F.R. § 220.6. And, despite Petitioners' comments stressing the fundamental alteration of circumstances in Wyoming attributable to the spread of CWD, USFS predicated its categorical exclusion upon "the fact that

this use has occurred for decades so the environmental impacts for a year continuation are understood, the lack of any significant issues identified during the scoping process, [and] the determination that there are no extraordinary circumstances affected . . . ." *Id.*

55.     Upon information and belief, artificial feeding of wild elk proceeded as approved under the 2017 Permit at both Dell Creek and Forest Park from January 1, 2017 to April 30, 2017.

56.     On December 19, 2017, USFS released a letter to interested stakeholders notifying them that it had received "applications from the [WGFC] to renew the special use authorizations to allow continued use of [NFS] land for the elk feedgrounds and related facilities located on the [BTNF] at Dell Creek (application dated 11/16/16) and Forest Park (application dated 11/20/2017)." Letter from Patricia O'Connor, Forest Supervisor, USFS, to Scott Talbot, Director, WGFC, at 1 (Dec. 19, 2017) ("2018 Reauthorization"). That letter, addressed to the Director of WGFC, indicated that WGFC's request—to continue artificial feeding at Dell Creek and Forest Park—was then "under consideration" by the USFS. *Id.* The one-page letter further provided that:

> Pending a final decision by the Forest Service in response to the [WGFC]'s applications for renewal of these permits, the use of NFS land for operation and maintenance of the Dell Creek and Forest Park feedgrounds may continue in accordance with the terms and conditions of the existing special use permits (BPY 100217 and GRY 100220) as provided by federal statute codified at 5 U.S.C. [§] 558(c), which states that "[w]hen the licensee has made timely and sufficient application for a renewal or a new license in accordance with agency rules, a license with reference to an activity of a continuing nature does not expire until the application has been finally determined by the agency."

*Id.* (third alteration in original). USFS's 2018 Reauthorization does not set forth any date by which the agency anticipates making a final determination on WGFC's request. Nor does the 2018 Reauthorization contemplate any expiration date for the feeding authorized in the letter.

Also absent from the 2018 Reauthorization is any finding by USFS that continued artificial feeding is "consistent with" the BTNF Forest Plan, as is required under USFS's own regulations. *See* 36 C.F.R. § 251.54(1). Moreover, nothing in either the 2017 Permit or 2018 Reauthorization evaluates the effects of those federal decisions upon the 2007 BEMP, which will likely be impacted by USFS's decision to reauthorize artificial feeding at Dell Creek and Forest Park. Nor did the Forest Service conduct any NEPA review for the 2018 Reauthorization, let alone state that this action was categorically excluded from NEPA review and supply the reasons supporting a categorical exclusion. Thus, the 2018 Reauthorization effectively authorizes indefinite artificial feeding at Dell Creek and Forest Park—all without ever having conducted any environmental analysis of the impacts associated with CWD, evaluating its consistency with the Forest Plan, or soliciting public input as required by the agency's own implementing regulations, 36 C.F.R. § 220.4.

57.     Upon information and belief, artificial feeding of wild elk proceeded under the 2018 Reauthorization at both Dell Creek and Forest Park from January 1, 2018 to April 30, 2018.

58.     Upon information and belief, artificial feeding of wild elk resumed under the 2018 Reauthorization at both Dell Creek and Forest Park on December 1, 2019 and is, to date, continuing at both feedgrounds. Indeed, recent communications between Petitioners and WGFC have revealed that, as of March 13, 2020, WGFC has fed approximately 500 elk at the Forest Park Feedground and WGFC has fed another 500 elk at the Dell Creek Feedground during the 2019-2020 feeding season. For the Dell Creek Feedground, 500 elk is twice the number of elk that USFS's 2017 Permit authorized WGFC to feed at the Dell Creek Feedground during the specified feeding season.

59.     To date, USFS has not issued any additional special use permits authorizing artificial feeding at either the Dell Creek or Forest Park feedgrounds. Nor has USFS provided any updated timetable as to when the agency expects to act upon WGFC's now-stale requests to continue artificial feeding at Dell Creek and Forest Park feedgrounds. Upon information and belief, both feedgrounds continue to operate under the authorizations set forth in the 2018 Reauthorization letter and without any environmental analysis supporting that reauthorization.

### D.     The Alkali Creek Feedground

#### *1.     General Background*

60.     The Alkali Creek Feedground is located in the Gros Ventre watershed. The feedground is adjacent to the Gros Ventre Wilderness, and lies within one mile of the Gros Ventre River.

61.     After emerging from its high mountain headwaters, the Gros Ventre River flows generally to the southwest, with the NER near its confluence with the Snake River in Jackson, Wyoming. Elk regularly travel between the NER and the Alkali Creek Feedground in the Gros Ventre Valley.

62.     In 2012, WGFC counted 3,300 elk in the Gros Ventre Valley. This number is well below the carrying capacity of the native winter range. USFS has previously acknowledged that "[a]dequate amount of winter range appears to be available for the 3,000 elk that currently use the Gros Ventre Valley, especially in mild or average winters." 2015 FSEIS, App'x 8 at 64. Therefore, the "primary use" of Alkali Creek Feedground is not to maintain or increase the elk population, but "to prevent movement of elk" to private lands and to the NER.  *Id.*

63.     Alkali Creek Feedground is located in a "natural bottleneck for elk movement and along a natural elk travel way," 2015 FSEIS at 114, and "is the most strategically-positioned to

limit elk movements." *Id.* at 83. It is also the "most westerly" feedground of the three in the Gros

Ventre watershed, and is the closest to both private lands and the NER. *Id.* at 82–83. According

to USFS, siting a feedground at the Alkali Creek location is desirable because the other two

feedgrounds in the Gros Ventre watershed "are less effective in limiting elk movement" to the

NER and private lands. *Id.* at 108.

64.     In 2012, some 2,345 elk were recorded as having fed at Alkali Creek. *Id.*, App'x 1

at 2. The elk that frequent Alkali Creek Feedground are considered to be part of the Jackson

herd. Artificial feeding at Alkali Creek begins in late December at the earliest, and extends to

mid-April at the latest.

65.     While the feedgrounds may help control elk movement, they do not prevent elk

movement. As USFS acknowledges, "[i]nterchange between the elk that use the Gros Ventre

watershed . . . and the [NER] is well documented." 2015 FSEIS at 82. Indeed, "[s]ome elk

*routinely* migrate out of the Gros Ventre watershed to the vicinity of Kelly, Wyoming, and on to

the [NER], and the reverse movement occurs as well." *Id.* (emphasis added). Since 1999,

increased wolf pressure has heavily influenced elk movement, often driving elk to congregate

into even larger groups and move between feedgrounds and onto the NER. *Id.*

66.     Between March and December 2012, up to 700 elk were observed moving down

the Gros Ventre watershed towards the NER. *Id.*, App'x 8 at 59–60.

### 2.     *The 2008 Feedgrounds EIS and ROD*

67.     In 1991, USFS issued a twenty-year special use permit to WGFC for the operation

of an artificial feedground at Alkali Creek. That permit expired on its own terms on December

31, 2011.

68.     In 2007, USFS received a request from WGFC to issue multiple twenty-year special use permits that would allow it to continue (or expand) its artificial feeding operations at six different sites within the BTNF, including the feedground at Alkali Creek.

69.     In response to that request, in 2008, USFS prepared an EIS that evaluated the consequences stemming from continued artificial feeding of wild elk at the six requested sites in the BTNF. The 2008 EIS evaluated three different alternatives: (1) a mid-range alternative that would authorize all requested feeding operations but prohibit the feedground expansions requested by WGFC; (2) a "no-action" alternative that contemplated denying WGFC's requested use of NFS lands; and (3) the "proposed alternative," which considered granting WGFC's request in its entirety, including WGFC's proposed expansion of the Patrol Cabin Feedground onto federal land.

70.     Ultimately, USFS decided to pursue a fourth course of action. USFS's permit, set forth in its 2008 Record of Decision, allowed WGFC to continue its feeding operations as requested, but denied its proposed expansion of the Patrol Cabin Feedground and delayed making a final determination as to the feedground at Alkali Creek. With respect to Alkali Creek, USFS indicated that "more information" regarding the precise boundaries of the Gros Ventre Wilderness, which abuts the Alkali Creek Feedground, was needed before a decision regarding artificial feeding at that location could be reached.

### 3.     The 2015 Alkali Creek Feedground Supplemental EIS and ROD

71.     In 2012, one year after the 1991 permit had expired, USFS issued a notice of intent to supplement the 2008 EIS to provide the long-awaited analysis for and decision on WGFC's request for a special use permit to operate Alkali Creek Feedground. The resulting

Final Supplemental EIS ("2015 FSEIS") and Draft Record of Decision were published on January 23, 2015.

72.      The 2015 FSEIS analyzed in depth only two alternatives—the "no-action" alternative of denying the permit, and the "preferred alternative" of issuing the permit as requested by WGFC. Under its preferred alternative, USFS contemplated authorizing WGFC's use of 91 acres at Alkali Creek to conduct its winter-feeding operations from early December until early April through the year 2028.

73.      On December 1, 2015, eleven months after the release of the 2015 FSEIS, the USFS issued the Final Record of Decision ("ROD"), which selected the preferred alternative and authorized WGFC to conduct artificial feeding at Alkali Creek Feedground until 2028.

### 4.      Petitioners' Challenge to the 2015 Alkali Creek Feedground Supplemental EIS and ROD and the 2018-2019 Feeding Season

74.      On June 5, 2017, Petitioners filed a challenge to the 2015 FSEIS and ROD in the U.S. District Court for the District of Columbia, seeking vacatur of those decisions until USFS came into compliance with NEPA, NFMA, and the MUSYA.

75.      On November 20, 2017, the U.S. District Court for the District of Columbia granted USFS's motion to transfer Petitioners' challenge to this Court.

76.      The parties filed their merits briefs in 2018. In their brief, Petitioners argued that: (1) USFS's refusal to examine any alternatives contemplating a phase out of artificial feeding at Alkali Creek gave short shrift to USFS's obligations under NEPA to consider less environmentally harmful alternatives; (2) USFS failed to take a "hard look" at the environmental impacts of its decision by inappropriately deferring to WGFC's assessment of the threats associated with CWD and the need for artificial feeding; and (3) USFS arbitrarily constrained its review of cumulative impacts by refusing to examine Alkali Creek in conjunction with other

feedgrounds in the BTNF, or with efforts by NPS and FWS to phase out artificial feeding on the
NER through its 2007 BEMP.

77.     In response, USFS (and WGFC, as intervenors) argued that it was not required to
consider phase-out alternatives because USFS was obligated to defer to WGFC's management
practices, which contemplated continuing to feed elk on state-owned grounds in the vicinity of
Alkali Creek. Thus, according to USFS, the impacts from CWD would be the same under any
course of action examined by the agency because the disease would continue to spread in the
vicinity of the BTNF. As to the impacts stemming from the spread of CWD and Alkali Creek's
amplification of that spread, USFS argued that its mere awareness of the issue discharged its
procedural duty under NEPA to take a "hard look" at the problem. Finally, with respect to
cumulative impacts, USFS asserted that the spread of CWD had already been analyzed in the
context of other BTNF feedgrounds under the agency's 2008 EIS, and the agency maintained
that it was under no obligation to revisit the science that emerged in the interim. Further, USFS
asserted that because no specific framework had yet emerged for the 2007 BEMP, there was
nothing for the agency to analyze.

78.     On September 14, 2018, this Court entered a Memorandum Decision and Order
("2018 Order") ruling in Petitioners' favor. *See generally W. Watersheds Project v. Christiansen*,
348 F. Supp. 3d 1204 (D. Wyo. 2018). With respect to the range of alternatives considered by
USFS, the Court recognized that Petitioners' challenge concerned "a straight-forward request by
a state agency to continue the long-term use of facilities on NFS lands at Alkali Creek as an elk
winter feedground." *Id.* at 1217. Thus, USFS's claimed inability to combat the spread of CWD,
"*when the issue concerns WGFD's use of NFS land*, was not a reasoned explanation for its
refusal to examine phase-out alternatives." *Id.* at 1217 (emphasis in original). The Court,

therefore, explained the "rule of reason" dictated that USFS "consider a shorter-term, reduced impact, and/or phase-out alternative for the use of Alkali Creek as a feedground, while taking steps to transition elk to natural winter range and support historical migration routes[.]" *Id.*

79.     As to whether USFS took a "hard look" at consequences of its decision to reauthorize artificial feeding, the Court found the agency's analysis wanting on several fronts. The Court began by noting that USFS's "failure to consider a reasonable range of alternatives results in the conclusion that the Service failed to take a hard look at the alternatives to the proposed action, some of which might mitigate impacts." *Id.* at 1219. USFS's narrow focus on only two alternatives—the no-action and preferred alternatives—led the agency to overlook CWD and artificial feeding's impacts on "the maintenance and enhancement of long-term productivity" of Alkali Creek, and whether those interests might have been preserved under a reasonable mid-range alternative. *Id.* Furthermore, the Court observed that "[t]here is also little to suggest the Service took a hard look at the irreversible and irretrievable commitment of resources" attributable to its decision. *Id.* Finally, the Court criticized USFS's wholesale deference to WGFC and its management objectives, holding that USFS was not excused "from taking a hard look at the consequences of *its* action to allow the long-term use of NFS lands at Alkali Creek as a feedground." *Id.* at 1220 (emphasis in original). Indeed, where USFS's own "BTNF Land and Resource Management Plan . . . includes a stated goal to '[h]elp re-establish historic elk migration routes to provide increased viewing and hunting opportunities for outfitters and clients,'" the Court noted that artificial feedgrounds—which increase "the risk of disease transmission" and "the risk that the site will be contaminated with prions for a very long time"— "seem to undermine this goal." *Id.*

80.     With respect to USFS's cumulative impacts analysis, the Court was similarly wary. Here, the Court concluded that "the finality of the 2008 FEIS does not eliminate the need for the Service to consider cumulative impacts from the integrated feedground program considering the best and currently available science that has advanced the understanding of CWD risk, transmission and mitigation since the 2008 analysis." *Id.* at 1221. Similarly, the Court concluded that the absence of a specific framework for phasing out artificial feeding on the NER did not preclude USFS from "rely[ing] on the good faith representation that the [NPS and FWS] aim to implement the transition sometime during the life of the Alkali Creek Feedground permit." *Id.* Therefore, USFS was "require[d] . . . to examine how granting the permit through 2028 or some shorter term would interrelate with, potentially support, or potentially undermine, the objectives of the combined agency work under the 2007 BEMP." *Id.*

81.     Having found USFS's environmental analysis deficient on numerous grounds under NEPA, the Court held that USFS's special use permit and ROD for Alkali Creek violated the APA. *Id.* at 1221. Accordingly, the Court vacated the permit and ROD, and remanded that decision to USFS to correct the errors outlined above before reauthorizing feeding at Alkali Creek. *Id.*

82.     Although the Court vacated the permit and ROD, it suggested in two separate footnotes that it may be appropriate for USFS to authorize artificial feeding at Alkali Creek for the 2018-2019 feeding season under a "temporary (one year) special use permit[]," which would allow the agency time to comply with the Court's Order. *See id.* at 1208 n.1; *see also id.* at 1221 n.19 (same).

83.     On September 26, 2018, shortly after the Court entered its Order, Petitioners sent a letter to USFS encouraging the agency to prepare "a comprehensive EIS examining the entire

'integrated feedground program,'" which "would enable [USFS] to gain a more complete understanding of the impacts of artificial feeding on the BTNF and its resources, and efficiently and effectively consider phase-out and reduced impact alternatives to minimize and mitigate those impacts." Letter from Elizabeth Lewis and William S. Eubanks II, on behalf of Petitioners, to Vicki Christiansen and Tricia O'Connor, USFS, at 3–4 (Sept. 26, 2018) (quoting *Christiansen*, 348 F. Supp. 3d at 1221). Such programmatic analysis, Petitioners explained, would provide USFS a suitable vehicle to discharge the obligations imposed by this Court's 2018 Order. *Id.* at 4. To that end, Petitioners invited USFS to engage in further discussions regarding a mutually agreeable path forward. *Id.*

84.     As a result of that letter, Petitioners and USFS participated in preliminary discussions in which, to Petitioners' understanding, the agency indicated that it was contemplating a BTNF-wide NEPA analysis to address the concerns outlined in the Court's 2018 Order. Contrary to Petitioners' understanding, however, USFS never issued a scoping notice or published any form of draft NEPA document undertaking either a site-specific analysis of the Alkali Creek Feedground or a programmatic evaluation of artificial feeding on the BTNF as a whole.

85.     Instead, on November 14, 2018, USFS issued a scoping notice setting forth its intent to issue a one-year special use permit to WGFC for the resumption of artificial feeding on 91 acres at Alkali Creek during the 2018-2019 feeding season. *See* Letter to Interested Parties from Patricia M. O'Connor, Forest Supervisor, USFS, at 1 (Nov. 14, 2018). As with prior decisions, USFS indicated in the notice that it intended to exempt its decision from NEPA review under a categorical exclusion pertaining to the "approval, modification, or continuation of minor,

short-term (1 year or less) special uses of National Forest System lands." *Id.* at (quoting 36

C.F.R. § 220.6(d)(8)).

86.     On November 20, 2018, Petitioners submitted objections to USFS's contemplated

reauthorization of feeding at Alkali Creek. *See* Letter from Lloyd Dorsey, Conservation Program

Manager, Sierra Club Wyoming Chapter, on behalf of Petitioners, to Mary Moore, District

Ranger, USFS (Nov. 20, 2019). In their comments, Petitioners opposed USFS's invocation of a

categorical exclusion, reemphasized the myriad detrimental environmental effects stemming

directly from artificial feeding, and encouraged USFS to reevaluate its forest-wide approach to

artificial feeding. *See generally id.*

87.     The next day, on November 21, 2018, Petitioners once again wrote to USFS to

inform the agency that a CWD-infected mule deer had been discovered by WGFC within the

boundaries of the GTNP, meaning that CWD had "been found to the east, west, southeast, and

southwest of Alkali Creek." Letter from Lloyd Dorsey, Conservation Program Manager, Sierra

Club Wyoming Chapter, on behalf of Petitioners, to Mary Moore, District Ranger, USFS, at 1

(Nov. 21, 2019). Because that discovery placed the CWD endemic zone within "the heart of the

[GYE] and well inside the range of the Jackson Elk Herd," Petitioners urged USFS to consider

alternatives to artificial feeding that could simultaneously control elk movement and prevent

infection of the Jackson herd. *Id.* at 2.

88.     Despite receiving a majority of comments opposing reauthorization without

NEPA review, on November 28, 2018, USFS notified interested stakeholders that it had decided

to issue a one-year permit to WGFC to resume artificial feeding operations at Alkali Creek for

the 2018-2019 season. *See* Letter to the File from Patricia M. O'Connor, Forest Supervisor,

USFS, at 1 (Nov. 28. 2018). Even while acknowledging the discovery of an infected deer in the

GTNP and the imminence of CWD's threat to the Jackson elk herd, USFS nevertheless

"determined that there [were] no significant effects" associated with its decision and, therefore,

abstained from any NEPA analysis by invoking the categorical exclusion described in its

November 14, 2018 scoping notice. *Id.* at 2.

89.     Upon information and belief, artificial feeding of wild elk proceeded at the Alkali

Creek Feedground during the 2018-2019 season as authorized by the November 28, 2018 letter.

###     *5.     The 2019 Alkali Creek Feedground Decision Memo*

90.     Notwithstanding this Court's September 2018 Order—and the fact that USFS

took no action to prepare any programmatic or site-specific NEPA analysis of the myriad

deficiencies identified by the Court over a year earlier—on September 20, 2019, USFS issued a

letter to interested stakeholders announcing its intent to reauthorize "WGFC to operate and

maintain the feedground on NFS land at Alkali Creek for five years, the 2019-2024 feeding

seasons, for emergency feeding only, to enable WGFC to phase out its use of the Alkali Creek

Feedground." *See* Letter to Interested Parties from Mary Moore, District Ranger, USFS, at 1

(Sept. 20, 2019) ("Alkali Scoping Notice"). According to USFS, the proposed permit would

allow artificial feeding to be conducted if WGFC determines that any one of the following

circumstances exist: (1) "If a significant elk damage or elk/livestock co-mingling situation

develops on nearby private land and it is deemed necessary to feed in order to draw and keep elk

away from the conflict on private land"; (2) "If it becomes necessary to catch or stop a large

down drainage movement of elk from Patrol Cabin or Fish Creek elk feedgrounds" or (3) "If

there are large numbers of elk, in excess of 300, staged at Alkali Creek, feeding has been

initiated at Patrol Cabin and Fish Creek Feedgrounds, and the elk at Alkali Creek are not

dispersing to other feedgrounds." *Id*. An "authorized officer of the Forest Service" must

"concur[] that one of these emergency situations exists and approve[] initiation of emergency feeding, including when emergency feeding must cease." *Id.* This notice further indicated that "[a]t the conclusion of five years, this authorization may be renewed for one additional five year period, if necessary, to complete the plan to eliminate feeding at Alkali Creek Feedground." *Id.* While referring to a "plan to eliminate feeding at Alkali Creek Feedground," this scoping notice did not provide any concrete information, let alone a binding commitment, to actually eliminate artificial feeding at Alkali Creek within any specific time frame. Nor, for that matter, did the scoping notice supply any reasoned basis for waiting to eliminate artificial feeding at Alkali Creek for five (or possibly ten) years, even if the agency was actually committing to such an outcome.

91.     According to the USFS, the artificial feeding operations contemplated by the Alkali Scoping Notice would be far smaller than those proposed in the 2015 FSEIS. Whereas the 2015 proposal envisioned feeding operations occupying roughly 91 acres, 2015 FSEIS at 6, the Alkali Scoping Notice alleges that its "emergency" feeding operations would encompass no more than 5 acres in total. According to USFS, "[t]he authorized facilities at the Alkali Creek Feedground include one elk tagging corral, one horse corral, one tack shed, one hay stack yard containing two haysheds, and a water facility, occupying approximately 1 acres [*sic*] of NFS land," while "[t]he remaining 4 acres of NFS land may be used for dispersed emergency spot feeding within the historic feedground permit area . . . ." Alkali Scoping Notice at 1. The four acres of spot feeding, USFS explained, "would include permitting the use of the route between Alkali Creek Feedground and Patrol Cabin Feedground to draw elk to Partol [*sic*] Cabin from Alkali Creek." *Id.* at 1–2.

36

92.     Based upon the alleged 5-acre footprint of the project, USFS preliminarily determined that its reauthorization of artificial feeding at Alkali Creek was likely exempt from NEPA review under the agency's own implementing regulations, 36 C.F.R. § 220.6(e)(3) ("Approval, modification, or continuation of minor special uses of NFS lands that require less than five contiguous acres of land."). *Id.* at 2.

93.     On October 17, 2019, Petitioners submitted objections to the proposal outlined within the Alkali Scoping Notice. *See* Letter from Lloyd Dorsey, Conservation Program Manager, Sierra Club Wyoming Chapter, on behalf of Petitioners, to Mary Moore, District Ranger, USFS (Oct. 17, 2019) ("Alkali Scoping Comments"). While Petitioners applauded USFS's purported goal of phasing out artificial feeding at Alkali Creek, they expressed serious skepticism as to whether USFS's proposal was little more than a veiled continuation of the status quo, which vests WGFC with significant discretion to determine whether artificial feeding should occur "at Alkali Creek under arbitrary, vague, and subjective criteria for as long as ten years." Alkali Scoping Comments at 1–2. Indeed, as Petitioners recognized, the Alkali Scoping Notice potentially authorizes WGFC to feed elk for "another ten years, into 2029 or even 2030"—one to two years longer than contemplated by the 2015 FSEIS and ROD that this Court vacated because they violated federal law. *Id.* at 8. Likewise, one of the predicate "emergency" conditions—"large numbers of elk, in excess of 300, staged at Alkali Creek," Alkali Scoping Notice at 1—would likely be met each year (or most years), as the average number of elk visiting Alkali Creek in the winter ranges between 454 and 473 individuals each winter. Alkali Scoping Comments at 9.

94.     Similarly, Petitioners expressed serious doubts about whether USFS's proposal could be squared with either this Court's 2018 holding in *Christiansen*, or with NEPA's

implementing regulations governing categorical exclusions. Petitioners reminded USFS that this Court found "[t]here is no question that Alkali Creek Feedground could become a reservoir for CWD infection if it becomes established in elk populations in northwest Wyoming," a prospect that "is increased with the concentration of elk at feedgrounds." *Christiansen*, 348 F. Supp. 3d at 1219–20. Yet by its own terms, the Alkali Scoping Notice proposes to condense into four acres a feedground operation that had previously spanned roughly 91 acres. *See* Alkali Scoping Comments at 3. Where this Court has found that such herd density "will *significantly affect* vegetation and soils, [and] thus productivity, over a very long term (if not indefinitely) and may result in an irreversible and irretrievable loss of wildlife and habitat," *Christiansen*, 348 F. Supp. 3d at 1220 (emphasis added), it is difficult to imagine "how this proposed action is consistent with the Court's ruling," or with NEPA's implementing regulations. Alkali Scoping Comments at 3; *see also id.* at 5 (noting that NEPA only permits reliance on categorical exclusions for "'actions which do not individually or cumulatively have a significant effect on the human environment'" (quoting 40 C.F.R. § 1508.4)).

95.    In addition, Petitioners questioned whether the Alkali Decision Memo actually comports with the terms of the categorical exclusion relied upon by USFS. In the Alkali Scoping Notice, USFS indicated that it planned to invoke 36 C.F.R. § 220.6(e)(3), which exempts from NEPA review the "[a]pproval, modification, or continuation of minor special uses of NFS lands that require less than five contiguous acres of land." And, while USFS explained that feeding operations would be shoe-horned within this five-acre parameter, including a feeding trail between Alkali Creek and Patrol Cabin meant to lure elk away from the site, Alkali Scoping Notice at 1, Petitioners questioned whether this was actually feasible. As Petitioners observed, "[i]t is approximately four miles between Alkali Creek and Patrol Cabin." Alkali Scoping

Comments at 4. Therefore, even at 20-feet wide, "a four-mile long corridor would amount to an additional 9.7 acres"—an area incompatible on its face with USFS's claimed exemption that may be no larger than 5 acres. *Id.* Furthermore, given the significant concentration of elk congregating on feedgrounds, Petitioners objected to USFS's characterization of the use as "minor," and further pointed out that "a four-mile long corridor indicates that the proposal has significantly changed from the previous authorization." *Id.* at 5.

96.     On December 13, 2019, over Petitioners' strenuous objections, USFS issued the Decision Memo challenged herein, reauthorizing artificial feeding at Alkali Creek for five years under the terms described in the Alkali Scoping Notice. *See* USFS, Decision Memo, Alkali Creek Feedground Five Year Permit, at 2 (Dec. 13, 2019) ("Alkali Decision Memo"). As forecasted by the Alkali Scoping Notice, USFS refused to prepare any NEPA analysis for its decision and concluded that its reauthorization was categorically exempt from NEPA review under 36 C.F.R. § 220.6(e)(3) ("Approval, modification, or continuation of minor special uses of NFS lands that require less than five contiguous acres of land."). *Id.* at 3. Remarkably, the agency reached this five-acre determination despite proposing to utilize a "feedline three feet wide and approximately 5.3 miles in length" between Alkali Creek and Patrol Cabin. *Id.* Nowhere in the memo did USFS explain how a five-mile long, three-foot wide trail, potentially visited by hundreds of elk that themselves range between six and eight feet long, would fit within its proposed five-acre footprint. Moreover, notwithstanding the numerous concerns raised by Petitioners, USFS summarily determined "that there are no extraordinary circumstances that would warrant further analysis and documentation in an EA or EIS." *Id.*

97.     In reauthorizing long-term artificial feeding at Alkali Creek, USFS failed to account for any of the considerations highlighted by this Court when it vacated the prior long-

term authorization of artificial feeding at Alkali Creek. Rather than provide any explanation as to

how USFS determined that "no extraordinary circumstances" existed in connection to its

decision, USFS simply cited the 2015 FSEIS—the environmental analysis this Court found

deficient in *Christiansen*. *Id.* And, despite this Court instructing USFS "to consider a shorter-

term, reduced impact, and/or phase-out alternative for the use of Alkali Creek as a feedground,"

*Christiansen*, 348 F. Supp. 3d at 1217, the agency effectively reauthorized the same feeding

program—without conducting the requisite alternatives analysis—for a period that potentially

*runs longer* than that contemplated by the 2015 FSEIS and ROD. *See* Alkali Scoping Comments

at 8. Although the Alkali Decision Memo indicates that USFS's "goal" is the "complete

cessation of feeding at Alkali Creek Feedground by or before the expiration date of th[e] permit,"

there is nothing in the memo that actually commits USFS to ending artificial feeding at Alkali

Creek. Indeed, nothing in USFS's decision discloses a date certain by which USFS will cease

artificial feeding practices at the site; nor does it provide any benchmarks by which the public

may evaluate whether USFS is making progress towards doing so. Further troubling is USFS's

disregard of this Court's instructions to evaluate how continued feeding at Alkali Creek "would

interrelate with, potentially support, or potentially undermine, the objectives of the . . . 2007

BEMP," or with "the integrated feedground program" on BTNF lands. *Christiansen*, 348 F.

Supp. 3d at 1221. Again, nothing in the Alkali Decision Memo even attempts to conduct that

analysis despite USFS's explicit acknowledgment that "elk may simply move to a different

feedground" as a result of its proposal. Alkali Decision Memo at 1. This failure is particularly

arbitrary in light of FWS's release of the 2019 Step-Down Plan, which asserts that it will

transition the same elk herd away from artificial feed to natural forage on the NER. *See* 2019

Step-Down Plan at 16.

40

98.     Since this matter was last before the Court, CWD has continued to move steadily across the state. "As of September 2019, CWD endemic areas have now virtually surrounded the upper Gros Ventre Valley and Alkali Creek watershed." Alkali Scoping Comments at 20. This is a particular cause for concern given the high concentration of elk observed at feedgrounds on the NER. Although final totals are unavailable because the season is still underway, to date, early recording data show that "[n]umbers of [wild elk] drawn to the [NER]'s feed lines are up significantly this winter, with 8,095 animals counted during an assessment" in mid-February. Mike Koshmrl, *Refuge Elk Count: 8,095*, Jackson Hole News & Guide (Feb. 28, 2020), https://bit.ly/2vQzUtg. These preliminary numbers represent an overall on-feed count that "is 11% greater than the 10-year average of 7,314 elk, and [] 23% higher than the 2019 tally of 6,586" during the same timeframe. *Id.* Thus, the introduction of CWD to the NER could result in the infection of essentially the entire Jackson elk herd, unless steps are taken to expeditiously reduce the artificial feeding (and the artificially high concentrations) of elk at Alkali Creek. Similarly, the frequency with which elk and mule deer (as CWD-transmission vectors) travel between the Dell Creek and Forest Park feedgrounds and the NER, coupled with their location between the NER and multiple CWD endemic areas, adds to the urgency of developing a management plan that fully analyzes and addresses the local and regional environmental impacts of artificial feeding, and seriously analyzes alternatives for timely eliminating or at least phasing out artificial feeding on BTNF lands.

## PETITIONERS' CLAIMS FOR RELIEF

### Claim 1 – Violations of NEPA

99.      All allegations set forth above are incorporated here by reference.

100.      This First Claim for Relief challenges Respondents' violations of NEPA, 42

U.S.C. § 4321–4347, as well as violations of CEQ's and USFS's implementing regulations, in

approving artificial feeding at the Alkali Creek, Dell Creek, and Forest Park feedgrounds.

Petitioners bring this claim pursuant to the judicial review provisions of the APA, 5 U.S.C. §

706. Respondents violated NEPA and federal regulations in multiple respects through issuance

of the challenged decisions, including but not limited to the following.

101.      With respect to all three feedgrounds at issue—Dell Creek, Forest Park, and

Alkali Creek feedgrounds—USFS continues to authorize WGFC to artificially feed elk despite

the well-known detrimental consequences of that activity, without having commenced, let alone

completed, the robust environmental analysis ordered by this Court nearly two years ago.

Because USFS has failed to prepare any NEPA review examining the legal defects identified by

this Court (including alternatives evaluating elimination or phasing out of artificial feeding on

the BTNF and the impacts of such alternatives as compared to the status quo)—whether in a

programmatic manner applied to all BTNF feedgrounds or in a more site-specific manner applied

to these specific feedgrounds—the agency's continued authorization, without any NEPA review,

of activities known to be extremely harmful violates NEPA, its implementing regulations, the

APA, and this Court's prior Order.

### A.      The Dell Creek and Forest Park Feedgrounds

102.      By refusing to prepare an EA or EIS in connection with either the 2017 Permit or

the 2018 Reauthorization, and by instead relying in the 2018 Reauthorization upon 5 U.S.C. §

558(c) to grant indefinite federal approval to WGFC to artificially feed elk at two separate feedgrounds, USFS has violated NEPA and its implementing regulations, and has acted arbitrarily, capriciously, and "without observance of procedure required by law" in violation of the APA, 5 U.S.C. § 706(2). As noted by the Tenth Circuit, USFS's "approval and issuance" of feedground permits for Forest Park and Dell Creek are "major federal action[s] contemplated by NEPA." *Tidwell*, 572 F.3d at 1123. Moreover, the nearly unanimous scientific conclusion that feedgrounds compound the transmission of CWD—coupled with that disease's deleterious ecosystem effects—reveals the environmental significance of USFS's decision to continue artificial feeding at these locations. For these reasons, USFS's issuance of the 2017 Permit and 2018 Reauthorization without preparing an EIS or EA violate NEPA, its implementing regulations, and the APA.

103.    Neither the USFS's invocation of a categorical exclusion for the 2017 Permit, nor the USFS's complete failure in its 2018 Reauthorization even to explain whether, and on what basis, it was entirely avoiding NEPA review, can be squared with NEPA, its implementing regulations, or the APA. Because the artificial feeding of unnaturally dense concentrations of elk authorized by these federal decisions causes highly detrimental impacts to the surrounding ecosystem, these USFS decisions individually and collectively constitute a "major federal action" with "significant" impacts on the environment. Accordingly, due to the grave significance of impacts authorized by USFS in these decisions that have resulted in indefinite feeding of elk at Forest Park and Dell Creek feedgrounds, coupled with the existence of "extraordinary circumstances" that prohibit USFS from categorically excluding these actions from NEPA review, USFS's invocation of a categorical exclusion for the 2017 Permit and the

total lack of any NEPA review accompanying the agency's 2018 Reauthorization violate NEPA, its implementing regulations, and the APA.

104.    Neither the categorical exclusion accompanying the 2017 Permit nor the non-existent NEPA review accompanying the 2018 Reauthorization examines feasible alternatives to authorizing artificial feeding at these two feedgrounds (such as timely elimination or phasing out of artificial feeding at these locations), impacts among alternatives as compared to the status quo, or cumulative impacts related to USFS's integrated feedground program on the BTNF or how USFS's continued artificial feeding at these feedgrounds will affect or undermine the objectives of NPS and FWS being implemented through the 2007 BEMP. The failure to take a hard look at the impacts of, and alternatives to, the deleterious action of artificial feeding at these feedgrounds violates NEPA, its implementing regulations, and the APA.

105.    By allowing WGFC, without any NEPA review whatsoever, to feed far more elk at Dell Creek Feedground pursuant to the 2017 Permit and/or 2018 Reauthorization than the 2017 Permit or 2018 Reauthorization actually authorized—i.e., WGFC fed approximately 500 elk at Dell Creek during the current feeding season despite the 2017 Permit's authorization of feeding of up to only 250 elk at that location—USFS's authorizations for feeding at Dell Creek violated NEPA, its implementing regulations, and the APA.

106.    By failing to issue a public scoping notice and by failing to solicit public comments on its 2018 Reauthorization, USFS violated the agency's own regulations implementing NEPA, and has acted arbitrarily and capriciously and "without observance of procedure required by law" in violation of the APA, 5 U.S.C. § 706(2). USFS's own NEPA regulations provide that "[s]coping is required for *all* Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in

44

an EA or an EIS," 36 C.F.R. § 220.4(e)(1) (emphasis added); *see also id.* § 251.54(g)(2)(ii)

(requiring that "the public shall receive adequate notice and an opportunity to comment upon a

special use proposal accepted as a formal application in accordance with Forest Service NEPA

procedures"). However, the 2018 Reauthorization, which authorizes WGFC to operate

feedgrounds at Dell Creek and Forest Park for an indeterminate time period, was issued without

any scoping procedures or public comment opportunity prior to its implementation. That failure

contravenes one of NEPA's fundamental mandates—to "[e]ncourage and facilitate public

involvement in decisions which affect the quality of the human environment," 40 C.F.R. §

15002—as well as USFS's own implementing regulations, 36 C.F.R. §§ 220.4(e), 251.54(g)(ii).

For these reasons, the 2018 Reauthorization violates NEPA, its implementing regulations, and

the APA.

### B.   *The Alkali Creek Feedground*

107.    By refusing to prepare an EIS or even an EA in connection with the Alkali

Decision Memo, and by instead deeming that decision to be categorically excluded from any

NEPA review, USFS has violated NEPA and its implementing regulations, and has acted

arbitrarily, capriciously, and "without observance of procedure required by law" in violation of

the APA, 5 U.S.C. § 706(2). USFS's authorization of purported "emergency" feeding operations

for at least five years at Alkali Creek is essentially a continuation of the feeding practices

rejected by this Court in *Christiansen*, in the absence of any new, robust analysis of alternatives

to artificial feeding and the impacts of feasible alternatives as compared to the status quo. Rather

than address the substantial deficiencies observed by this Court, USFS has inappropriately relied

upon a categorical exclusion to fast track its previous commitment to WGFC and evade its

obligations under NEPA. Nevertheless, the same issues underlying its 2015 FSEIS remain. CWD

continues to be a significant threat to the ecological health of the BTNF (and if anything has worsened since the Court issued its 2018 Order), and that threat is magnified by congregating elk on artificial feedgrounds, as USFS's Alkali Decision Memo expressly authorizes. USFS's reauthorization of artificial feeding at Alkali Creek—for a time period potentially longer than that contemplated in the 2015 FSEIS (i.e., because USFS has not committed to any date certain by which it will eliminate or phase our artificial feeding at Alkali Creek)—will, therefore, "individually [and] cumulatively have a significant effect on the human environment," 40 C.F.R. § 1508.4, as contemplated by NEPA and its implementing regulations. For this reason, a categorical exclusion is an inappropriate vehicle for assessing the highly significant impacts of artificial feeding that USFS has now authorized at Alkali Creek for at least five years, and USFS's Alkali Decision Memo thus violates NEPA, its implementing regulations, and the APA.

108.    By relying on 36 C.F.R. § 220.6(e)(3) ("[a]pproval, modification, or continuation of minor special uses of NFS lands that require less than five contiguous acres of land") to exempt the Alkali Decision Memo from NEPA review, USFS has violated NEPA and the agency's own implementing regulations, and has acted arbitrarily, capriciously, and "without observance of procedure required by law" in violation of the APA, 5 U.S.C. § 706(2). Although the Alkali Decision Memo contends that feeding operations will fit within a five-acre footprint, thereby allowing the agency to rely upon 36 C.F.R. § 220.6(e)(3), that allegation fails as a matter of common sense. The Alkali Decision Memo claims the permit area will ostensibly consist of "approximately 1 acre of facilities at Alkali Creek Feedground, approximately 2 acres at Alkali Creek Feedground for dispersed emergency spot feeding and *approximately 2 acres for trailing elk from Alkali Creek to Patrol Cabin utilizing a feedline three feet wide and approximately 5.3 miles in length*." Alkali Decision Memo at 3 (emphasis added). However, the average number of

elk visiting the Alkali Creek Feedground during the winter typically number in the hundreds. These animals are, on average, between six and eight feet long themselves. Therefore, the Alkali Decision Memo severely underestimates the footprint of its own project and arbitrarily disregards the impacts to the soil and vegetation that the herd will have along the periphery of its proposed feedline. Nor, as this Court has found, is there anything "minor" about WGFC's continued artificial feeding of elk and the environmentally destructive effects that it has on the ecological health of the BTNF. Accordingly, USFS arbitrarily invoked 36 C.F.R. § 220.6(e)(3) to exempt its decision from NEPA review, which violates NEPA, its implementing regulations, and the APA.

109.     USFS's invocation of a categorical exclusion to evade NEPA review for its reauthorization of feeding at Alkali Creek arbitrarily neglects the existence of "extraordinary circumstances," 36 C.F.R. § 220.6(a), that preclude USFS's reliance on a categorical exclusion under its own NEPA implementing regulations. *Id.* Indeed, the intensifying spread of CWD across the state—as accelerated by artificial feeding programs such as that at Alkali Creek— poses a grave threat to the ecological health of numerous "[c]ongressionally designated areas," 36 C.F.R. § 220.6(b), including the NER, GTNP, and the Gros Ventre Wilderness, and the unique resources protected therein. USFS's unexplained and cursory conclusion—"that there are no extraordinary circumstances that would warrant further analysis and documentation in an EA or EIS," Alkali Decision Memo at 3—does not reflect reality and cannot pass muster under NEPA or the agency's own implementing regulations. 40 C.F.R. § 1508.4; 36 C.F.R. § 220.6. Therefore, USFS's determination that no extraordinary circumstances exist violates NEPA, its implementing regulations, and the APA.

110.    The categorical exclusion accompanying the Alkali Decision Memo does not examine feasible alternatives to authorizing artificial feeding at this feedground (such as timely elimination or phasing out of artificial feeding at this location), impacts among alternatives as compared to the status quo, or cumulative impacts related to USFS's integrated feedground program on the BTNF or how USFS's continued artificial feeding at this feedground will likely affect or undermine the objectives of NPS and FWS being implemented through the 2007 BEMP and/or the 2019 Step-Down Plan. The failure to take a hard look at the impacts of, and alternatives to, the deleterious action of artificial feeding at this feedground violates NEPA, its implementing regulations, and the APA.

## Claim 2 – Violations of the APA

111.    All allegations set forth above are incorporated here by reference.

### A.    The Dell Creek and Forest Park Feedgrounds

112.    By issuing the 2018 Reauthorization and thereby authorizing indefinite artificial feeding at Dell Creek and Forest Park, USFS has acted arbitrarily, capriciously, and "without observance of procedure required by law" in violation of the APA, 5 U.S.C. § 706(2), and the agency's own regulations. By effectively granting a permit authorizing artificial feeding at Dell Creek and Forest Park for an indefinite time period with no end date, USFS conferred federal authorization to WGFC to undertake an extremely harmful activity on federal public lands without notifying the public of that proposal or soliciting public comment before issuing the 2018 Reauthorization. These failures constitute violations of the APA and USFS's own regulations that require notice and comment for all special use permit proposals, *see* 36 C.F.R. § 251.54(g)(2)(ii) (requiring that "the public shall receive adequate notice and an opportunity to comment upon a special use proposal accepted as a formal application").

113.    By relying, in the 2018 Reauthorization, on 5 U.S.C. § 558(c) to arbitrarily extend the agency's ordinarily brief special use permit decision-making process for several years, during which time WGFC has conducted artificial feeding at two separate feedgrounds in three winter feeding seasons, USFS has acted arbitrarily, capriciously, and not in accordance with law, and has abused its discretion in violation of the APA.

114.    By relying, in the 2018 Reauthorization, on 5 U.S.C. § 558(c) to authorize continued artificial feeding at Dell Creek and Forest Park feedgrounds, while stating that the permit decision was then "under consideration," USFS violated Sections 706(1) and 706(2) of the APA by failing to timely finalize its decision-making process and instead allowing WGFC to indefinitely feed elk at these feedgrounds without notifying the public of any permit proposal, soliciting public comment on such a proposal, or issuing a final permit containing terms and conditions for minimizing harm to the BTNF. The failure to finalize this decision-making process is arbitrary, capricious, and not in accordance with law in violation of the APA, *see* 5 U.S.C. § 706(2), and alternatively is agency action that has been unlawfully withheld or unreasonably delayed, *see id.* § 706(1).

115.    Because USFS never concluded the 2018 Reauthorization process by issuing a final permit subject to public comment, USFS has failed to issue a lawful special use permit to WGFC to artificially feed elk at Dell Creek or Forest Park. In the absence of a lawful permit to conduct these activities, USFS has not complied with its own regulations that require the agency to adopt for all activities subject to special use permits "[t]erms and conditions which will . . . [m]inimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." 36 C.F.R. § 251.56(a)(1)(i)(B). Nor does the 2018 Reauthorization provide the most basic term of such authorization—i.e., the date when the authorization expires.

USFS's failure to satisfy its own regulations or to notify the permittee and the public as to the authorization's end date is arbitrary, capricious, contrary to law, and an abuse of discretion, *see* 5 U.S.C. § 706(2), and alternatively is agency action that has been unlawfully withheld or unreasonably delayed, *see id.* § 706(1).

116.    USFS's own regulations governing the issuance of special use permits provide that USFS has an independent obligation to ensure that special uses of NFS land are "consistent or can be made consistent with standards and guidelines in the applicable forest land and resource management plan . . . ." 36 C.F.R. § 251.54(e)(1)(ii). If "[t]he proposed use would be inconsistent or incompatible with the purposes for which the lands are managed," USFS is required to "reject" that proposal. *Id.* § 251.54(e)(5)(i). Whereas the BTNF Forest Plan Goal 1.1 seeks to "re-establish historic elk migration routes and to provide increased viewing and hunting opportunities for outfitters and clients," *see* BTNF Land and Resource Management Plan at 140 (1990), USFS's 2018 Reauthorization allowing artificial feedgrounds to continue jeopardizing the health of local elk herds arbitrarily violates its own implementing regulations, abuses the agency's discretion, and has been adopted "without observance of procedure required by law" in violation of the APA, 5 U.S.C. § 706(2); *see also Christiansen*, 348 F. Supp. 3d at 1220 (noting that "feedgrounds seem to undermine" Forest Plan Goal 1.1). Alternatively, USFS has unlawfully withheld and unreasonably delayed action required by law and by the agency's own regulations by failing to issue a determination as to the 2018 Reauthorization's consistency with the BTNF Forest Plan, in violation of 5 U.S.C. § 706(1).

117.    By determining that the 2017 Permit (and the artificial feeding allowed pursuant to that permit) is consistent with the standards and guidelines in the BTNF Forest Plan—and in particular, Forest Plan Goal 1.1—USFS acted arbitrarily, capriciously, not in accordance with

law, and abused its discretion in violation of the APA, 5 U.S.C. § 706(2), and the agency's own regulations, *see* 36 C.F.R. § 251.54(e)(ii).

118.    By conferring federal authorization to WGFC through the 2017 Permit and/or the 2018 Reauthorization to feed elk at the Dell Creek Feedground in excess of the maximum number allowed by USFS's most recent permit (i.e., the 2017 Permit's limitation of feeding to no more than 250 elk at Dell Creek)—which resulted in approximately 500 elk being fed this winter at Dell Creek in the absence of any new special use permit or other final decision authorizing feeding of this significantly higher number of elk at Dell Creek—USFS acted arbitrarily, capriciously, and not in accordance with law, *see* 5 U.S.C. § 706(2), and alternatively unlawfully withheld or unreasonably delayed action required by law before WGFC can feed much larger numbers of elk pursuant to federal authorization, *see id.* § 706(1).

### B.    *The Alkali Creek Feedground*

119.    By refusing to conduct the additional environmental analysis ordered by this Court, and by instead reauthorizing functionally the same artificial feeding program through the Alkali Decision Memo, USFS has acted arbitrarily, capriciously, and "without observance of procedure required by law" in violation of the APA, 5 U.S.C. § 706(2). Despite this Court's 2018 Order identifying numerous significant deficiencies with Respondents' prior examination of the impacts associated with artificial feeding at Alkali Creek, Respondents have functionally reauthorized the same program through the utilization of a categorical exclusion under NEPA, thereby permitting USFS to disregard this Court's explicit directives upon remand. Indeed, in reauthorizing feeding for at least five years, Respondents have yet to take "a hard look at the consequences of its action to allow the long-term use of NFS lands at Alkali Creek as a feedground." *Christiansen*, 348 F. Supp. 3d at 1220. Nor has the agency "examine[d] how

granting the permit through 2028 or some shorter term would interrelate with, potentially

support, or potentially undermine, the objectives of the combined agency work under the 2007

BEMP" and/or the 2019 Step-Down Plan. *Id.* Nor has USFS conducted any rigorous examination

of alternatives that would timely eliminate or at least phase out artificial feeding on the BTNF by

a date certain before an ecological catastrophe reaches the Jackson elk herd. Because the agency

has not addressed the analytical deficiencies noted by this Court, and has instead reauthorized

feeding at Alkali Creek through the arbitrary invocation of a categorical exclusion, USFS has

acted arbitrarily, capriciously, and "without observance of procedure required by law" in

violation of the APA, 5 U.S.C. § 706(2). Alternatively, because this Court ordered Respondents

to conduct robust NEPA analysis in September 2018 to analyze destructive actions the agency

had at that time already approved for three years, the agency's failure to complete (let alone

commence) the Court-ordered NEPA review process required by law, while repeatedly

authorizing continued artificial feeding on BTNF feedgrounds including Alkali Creek,

constitutes agency action that has been unlawfully withheld or unreasonably delayed, *id.* §

706(1).

      120.    By determining that the Alkali Decision Memo (and the artificial feeding allowed

pursuant to that permit) is consistent with the standards and guidelines in the BTNF Forest

Plan—and in particular Forest Plan Goal 1.1—USFS acted arbitrarily, capriciously, not in

accordance with law, and abused its discretion in violation of the APA, 5 U.S.C. § 706(2), and

the agency's own regulations, *see* 36 C.F.R. § 251.54(e)(ii).

      121.    USFS purported to base its five-year special use permit decision and

accompanying refusal to conduct NEPA review on affording "management flexibility while

allowing WGFC adequate opportunity to eliminate feeding on NFS land at the Alkali Creek

Feedground" and thereby "provid[ing] an opportunity for elk to transition to native winter range over time." Alkali Decision Memo at 1. However, nowhere in the permit decision or accompanying categorical exclusion did USFS commit to any binding timeline for eliminating or phasing out artificial feeding at Alkali Creek, nor did USFS explain why WGFC, rather than USFS, is authorized to make the decision to eliminate feeding on the BTNF. USFS's failure to commit to any binding timeline for elimination or phasing out of artificial feeding (while simultaneously relying on it to justify the permit decision) and its deferral of federal decision-making authority to WGFC to eliminate (or not eliminate) artificial feeding is arbitrary, capricious, not in accordance with law, and an abuse of discretion in violation of the APA, *see* 5 U.S.C. § 706(2).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court:

(1)      Declare that the USFS's Alkali Decision Memo, which permits the operation of Alkali Creek Feedground as described herein, violates NEPA, NFMA, the MUSYA, and the APA;

(2)      Declare that the USFS's 2018 Reauthorization—or, in the alternative, the 2017 Permit—which authorizes the operation of Dell Creek and Forest Park feedgrounds as described herein, violates NEPA, NFMA, the MUSYA, and the APA;

(3)      Set aside and remand the Alkali Decision Memo, 2018 Reauthorization—or, in the alternative, the 2017 Permit—pending the preparation of environmental analysis consistent with the requirements of NEPA, NFMA, the MUSYA, and the APA;

(4)     Enjoin Respondents from authorizing the continued operation of Alkali Creek,

Forest Park, and Dell Creek feedgrounds until they have fully complied with all of their

obligations under NEPA, the NFMA, the MUSYA, and the APA;

(5)     Award Petitioners their attorneys' fees and costs; and

(6)     Grant Petitioners such other and further relief that the Court may deem is just and

proper.

Respectfully submitted this 20th day of April, 2020.

Nathan D. Rectanus
Wyo. Bar. No. 7-5284
Lubing Law Group, LLC
P.O. Box 3894
Jackson, WY 83001
Phone: (307) 733-7242
Fax: (307) 733-7471
nate@lubinglawgroup.com

Matthew R. Arnold
(Admission *pro hac vice* pending)
Eubanks & Associates, LLC
1331 H Street, NW, Suite 902
Washington, DC 20005
Phone: (843) 718-4513
matt@eubankslegal.com

William S. Eubanks II
(Admission *pro hac vice* pending)
Eubanks & Associates, LLC
2601 S. Lemay Avenue, Unit 7-240
Fort Collins, CO 80525
Phone: (970) 703-6060
bill@eubankslegal.com