

**FILED**

10:46 am, 9/21/21

**Margaret Botkins
Clerk of Court**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

WESTERN WATERSHEDS PROJECT,
et al.,

               Petitioners,

vs.

VICKI CHRISTIANSEN, et al.,

               Respondents,

STATE OF WYOMING, et al,

               Intervenors-Respondents

Case No.  20-CV-0067

---

**ORDER AFFIRMING IN PART AND REVERSING AND REMANDING
IN PART AGENCY ACTION**

---

This is the latest challenge by Western Watersheds Project, Sierra Club, Wyoming

Wildlife Advocates and Gallatin Wildlife Association (Petitioners) to supplemental winter

feeding of elk in the Bridger-Teton National Forest ("BTNF") based on concerns about the

spread of chronic wasting disease ("CWD").  The dispute has been fully briefed by

Petitioners (CM/ECF Document ("Doc.") 42 & 67), Respondents (collectively referred to

as the United States Forest Service or "USFS") (Doc. 62), Intervenor-Respondent State of

Wyoming (Doc. 63), and Intervenors-Respondents Wyoming Outfitters and Guides

Association, Jackson Hole Outfitters and Guides Association, Sublette County Outfitters

and Guides Association, and Safari Club International (collectively referred to as "the Hunting Coalition") (Doc. 64). Various Amici Curiae have also submitted briefs in support of Petitioners.[1] The Court has read all briefs, reviewed the administrative record, and is fully informed in the premises.

As additional background, this Court previously vacated and remanded the USFS's decision to reauthorize feedground activities at Alkali Creek based on its failure under the National Environmental Policy Act (NEPA) to consider the science regarding CWD risk, transmission and mitigation.[2] *Western Watersheds Project v. Christiansen*, 348 F.Supp. 3d 1204 (D. Wyo. 2018) ("*Christiansen*"). The instant case not only concerns the Alkali Creek feedground once again, but also challenges the continuation of supplemental feeding at the Forest Park and Dell Creek feedgrounds. More specifically, the petition challenges: (1) the approval of the Wyoming Game and Fish Commission's (WGFC) request to resume feeding operations at Alkali Creek without first conducting the environmental analysis previously ordered by this Court; and (2) the agency's indefinite authorization of artificial feeding at Dell Creek and Forest Park feedgrounds without issuing the requisite special use permit under the USFS regulations, 36 C.F.R. § 251.54(1)(e), or conducting any environmental analysis under NEPA, 42 U.S.C. §§ 4321-4347. Doc. 1, p. 2.

---

[1] Amici Curiae briefs were filed by Buffalo Roam Tours, Dr. Thomas Michael Power, and Benjamin Sinclair ("the Jackson Economy Advocates") (Doc. 59), Robert Farris-Olsen, Denise Hayman, Thomas France, and Andrea Olsen ("Montana legislators") (Doc. 53), Dr. Bruce Smith, Dr. Thomas Roffe, Dr. Barry Noon, and Dr. Perry Barboza individually and on behalf of the Conservation Committee of the American Society of Mammalogists ("Scientists") (Doc. 58).

[2] The Court's decision did not address any issuance by the USFS of temporary (one year) special use permits.

For the following reasons, the Court agrees with Petitioners that (1) the USFS must conduct environmental analysis for the Alkali Creek feedground but will not vacate the permit; and (2) the one year special use permit for feeding at the Dell Creek feedground (BPY100217) expired by its terms.  The Court agrees with Respondents that: (1) the one-year special use permit for Forest Park (GRY100220) is valid; and (2) there is no final agency action for review concerning ongoing feeding at the Forest Park feedground and thus the Court lacks jurisdiction to consider Petitioners' challenges to continued supplemental winter feeding at Forest Park pending a final decision on the application.

## BACKGROUND

I.   Legal Framework

Under NEPA, federal agencies must consider the potential environmental impact of all agency actions. 40 C.F.R. § 1508.8. Actions generally require the preparation of an Environmental Assessment ("EA"), *id.* § 1508.9, an Environmental Impact Statement ("EIS"), *id.* § 1502.9, or both. An EIS is required for "major Federal action[s] significantly impacting the quality of the human environment." 42 U.S.C. § 4332(c).

Agencies also may identify categories of actions that under normal circumstances do not have significant environmental impacts individually or cumulatively. Such actions fall under "categorical exclusions" ("CEs"), and agencies need not prepare an EA or an EIS when undertaking those actions because they are excluded—as a category of actions with insignificant impacts—from NEPA review. *Id.* § 1507.3(b); *id.* § 1508.4; *see also* 36 C.F.R. § 220.6 (USFS regulations governing CEs).  If an agency recognizes CEs, the procedure "shall provide for extraordinary circumstances in which a normally excluded

action may have a significant environmental effect." 40 C.F.R. § 1508.4. If any "extraordinary circumstance" is present, the agency must prepare an EIS or an EA. *Id.* § 1501.4. The USFS regulations identify "[r]esource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS." 36 C.F.R. § 220.6(b).

The National Forest Management Act (NFMA), 16 U.S.C. §§ 472a, 521b, 1600-1614, and the Multiple-Use and Sustained Yield Act ("MUSYA"), *id.* §§ 528-531, govern the administration of National Forest System (NFS) lands and resources. Pursuant to these laws, the USFS has promulgated regulations governing special use permits (SUPs), which authorize the "use or occupancy of [NFS] lands and specif[y] the terms and conditions under which the use or occupancy may occur." 36 C.F.R. § 251.51.

Before granting any application, the USFS must ensure the proposed use is consistent with all applicable federal laws, "consistent or can be made consistent with standards and guidelines in the applicable [forest plan]," and "will not pose a serious or substantial risk to public health or safety." *Id.* at § 251.50(a). The USFS may renew SUPs so long as that use "remains consistent with the decision that approved the expiring special use," and the permitted area "is being operated and maintained in accordance with all the provisions of the authorization." *Id.* at § 251.64(a).

II.  Chronic Wasting Disease (CWD)

CWD is an incurable and invariably fatal disease caused by an abnormal protein that affects the central nervous system of ungulates, including elk, mule and white-tailed deer, and moose. AR3549. Its effects are devastating; the onset of disease is slow, and those

4

infected "show weight loss, reluctance to move, excessive salivation, droopy ears, increased drinking and urinating, lethargy, and eventually death." *Id.*

Further, "CWD is highly transmissible via multiple direct and indirect pathways between and among cervid species." AR486. It is transmitted through contact with infected animals or carcasses, and through contact with soil, plants, or feed contaminated with urine, feces, and/or saliva from infected animals. *Id.* CWD exhibits a long latency period (twelve to thirty-six months), during which an infected animal is asymptomatic yet still capable of passing the infectious prions to others. AR487; AR1802. Thus, a single infected animal can transmit the disease to a substantial portion of the population before its presence is detected. AR1798.

Moreover, recent research has shown that CWD, which is "resistant to most general disinfectants," can contaminate soil and remain infective in the environment "for years to decades." AR1802-03 (CWD "prions bound to soil are more infective than free prions, so soil may serve both as an environmental reservoir and a facilitator of CWD prion transmission."). Hence, uninfected animals are at risk of contracting CWD from the environment long after an infected individual has visited the area or died. *Id.*; AR489-90.

Once introduced into a population, CWD "*by itself* can exceed natural rates of mortality," reduce survival of adult females, and decrease population growth of elk herds. AR492-93. Although CWD has not yet been detected at a feedground in the BTNF, it has moved steadily across Wyoming and now surrounds the feedgrounds at issue in this case. *Compare* AR1826 (Statewide CWD Distribution Map), *with* AR520 (Feedgrounds Map);

*see also* AR3744 (as of November 2019, "WGFD believes CWD may be found in every deer herd in the state.").

The WGFC monitors elk herds for CWD prevalence and distribution. See, e.g., AR3660 (CWD surveillance report for October 2018-April 2019). While there were no CWD detections at Forest Park, Dell Creek or Alkali Creek to date, there is no dispute that "congregating elk at very high densities at feedgrounds is likely to increase the spread of disease because of an increased number and rate of potential infectious contacts with infected individuals and an infected environment." AR486; *see also* AR1803 (Feedgrounds "increase the risk of [CWD] transmission" by "exacerbating [] densities, increasing contact rates, altering normal behavior, and prolonging exposure to potentially contaminated areas.").

II.  <u>The Feedgrounds at Issue</u>

This Court previously summarized the history of supplemental winter feeding in Wyoming:[3]

> Wyoming first started to provide supplemental feed to elk in the early 1900's to prevent large-scale die-offs during hard winters. Since those early years, feedgrounds have also become an important tool for the State to reduce damage to haystack yards and winter pastures on private lands[4] and to reduce the potential for transmission of brucellosis to livestock.[5] On NFS lands, elk feedgrounds are strategically placed near the boundaries to gather elk as they transition from summer ranges down to lower elevations, mostly preventing elk from migrating through private lands in route to lower elevations. Service regulations require authorization for feedground use and occupancy on NFS lands.

---

[3] A map of all 23 current Wyoming feedground locations is at Doc. 62, p. 12.

[4] Wyoming state law imposes liability on the WGFD Commission to pay for damages to crops caused by big game animals.

[5] Brucellosis is a highly contagious bacterial disease that typically causes an infected female to abort her first calf following infection, and even subsequent calves.

> State-operated feedgrounds are located on BLM, Forest Service, State, and private lands. . . . .   The practice of supplemental feeding is quite controversial and has been the subject of litigation.  *See, e.g.*, *Defs. of Wildlife v. Salazar*, 651 F.3d 112 (D.C. Cir. 2011); *Greater Yellowstone Coal. v. Tidwell*, 572 F.3d 1115 (10th Cir. 2009).

*Christiansen*, 348 F.Supp. 3d at 1210 (simplified).  This case challenges the practice at three USFS-authorized feedgrounds operated by the WGFC:

*A. Dell Creek*

The Dell Creek feedground, which has been operated by the WGFC for over forty years, is located in Sublette County east of Bondurant. AR1152.  By application dated November 16, 2016, the WGFC sought a new permit at Dell Creek to cover thirty-five acres. AR1143.  The USFS issued a scoping notice soliciting comment on a one-year reauthorization of the Dell Creek permit, and noted that one acre had been previously permitted but "[i]n practice," elk are fed "within a 35-acre area." AR1152-54.  The USFS also noted that it expected to reauthorize the feedground under a CE authorized by 36 C.F.R. § 220.6(d)(8), which exempts the approval of minor, short-term (1 year or less) special uses of NFS lands. AR1154.

Petitioners submitted comments urging the USFS to end artificial feeding to stem the spread of CWD, and also argued that a CE was inappropriate under the circumstances. AR1139-40, 1170-74.  Petitioners requested that the USFS carefully examine the significant environmental impacts of its decision, including the role that continuing feeding plays in the propagation of CWD in the BTNF. AR1172-73.

On January 3, 2017, the USFS provided notice that it would approve a one-year SUP for the Dell Creek feedground, and stated the "permit authorizes a previously existing use and does not involve new or expanded forms of use." AR1203, 1206-20 (SUP BPY100217). The USFS invoked the CE at 36 C.F.R. § 220.6(d)(8). AR1203-04. By its terms, the SUP was not renewable and "expire[s] at midnight on 12/31/2017." AR1206. The record contains no new application or documented request by WGFC to feed elk at Dell Creek.[6]

On December 19, 2017, the USFS issued a letter advising the WGFC that its application dated November 16, 2016 was "under consideration" and, pending a final decision, the use of the Dell Creek feedground "may continue in accordance with the terms and conditions" of the existing SUPs "as provided by federal statute codified at 5 U.S.C. 558(c)." AR1240. The record discloses no further action taken by the USFS. However, over the past four years, the "continuation" has resulted in ongoing supplemental feeding. The WGFC fed 327 elk in the 2017-18 season, and 390 elk in the 2018-19 season.[7] AR1606. The record doesn't contain feeding summaries for the 2019-20 or the 2020-21 seasons, but there is no representation that supplemental feeding has ceased at this feedground.

---

[6] The USFS issued a notice relating to Forest Park and Dell Creek which states, "the WGFC has requested the continued use of these feedgrounds in 2017." Doc. 1203. However, there is no record of any WGFC request for Dell Creek.

[7] Petitioners note these totals exceed the USFS representation that "up to 250 elk" would be fed at Dell Creek annually. AR1152.

B. *Forest Park*

The Forest Park feedground is located in Lincoln County, Wyoming, fourteen miles northeast of Afton. AR1152.  As with Dell Creek, this feedground has been operated by WGFC for over forty years. AR1152.  In 1998, the USFS issued a SUP for this feedground which, by its terms, was subject to renewal but would otherwise expire on December 31, 2016. AR1128.  The record contains no request by the WGFC for renewal or for a new permit after expiration.  Despite no record request from WGFC, on November 16, 2016, the USFS provided notice that it was considering reauthorizing feeding at Forest Park for one year. AR1152.

Petitioners objected to the Forest Park proposal through the same comment letter submitted on Dell Creek. AR1133-42, 1166-91.  However, the USFS again gave notice that it would approve a one-year SUP for the Forest Park Feedground and it again invoked the CE at 36 C.F.R. § 220.6(d)(8) to exclude the action from further analysis and documentation in an EIS or EA. AR1203, 1221-34 (SPU GRY100220).  Like the 2017 Dell Creek SUP, the permit for Forest Park "expire[d] at midnight on 12/31/2017." AR1221.

On November 20, 2017, the WGFC applied for a renewed permit for Forest Park. AR1235-39.  On December 19, 2017, the USFS issued a letter advising the WGFC that its application dated November 20, 2017 was "under consideration" and, pending a final decision, the use of the Forest Creek feedground "may continue in accordance with the terms and conditions" of the existing SUPs "as provided by federal statute codified at 5 U.S.C. 558(c)." AR1240.  The record discloses no further action taken by the USFS on the

application.  However, over the past four years, the "continuation" has resulted in ongoing supplemental feeding.  At Forest Park, the WGFC fed 579 elk in the 2017-18 season, and 467 elk in the 2018-19 season. AR1608.  The record doesn't contain feeding summaries for the 2019-20 or the 2020-21 seasons, but again, there is no representation that supplemental feeding has ceased.

### C.  Alkali Creek

The history and use of Alkali Creek feedground is thoroughly discussed in *Christiansen*.  Following this Court's vacation and remand, the USFS issued a one-year SUP for Alkali Creek. AR983-95.  The USFS invoked the same CE it relied on for Dell Creek and Forest Park. AR979-82, 983-95.  Then, in September 2019, the USFS announced that it was planning to allow WGFC "to operate and maintain the feedground on NFS land at Alkali Creek for five years, the 2019-2024 feeding seasons, for emergency feeding only, to enable WGFC to phase out its use of the Alkali Creek Feedground." AR996-99. Under the SUP, feeding would occur where a USFS official agreed that any of the following conditions exist: (1) a "significant elk damage or elk/livestock co-mingling situation develops on nearby private land"; (2) "it becomes necessary to catch or stop a large down drainage movement of elk" from nearby feedgrounds; or (3) "there are large numbers of elk, in excess of 300, staged at Alkali Creek, feeding has been initiated at [nearby feedgrounds], and the elk at Alkali Creek are not dispersing" to those feedgrounds. AR996.

The USFS preliminarily concluded that its proposed action would be exempt from NEPA review under 36 C.F.R. § 220.6(e)(3), which applies to the "[a]pproval,

modification, or continuation of *minor* special uses of NFS lands that require *less than five contiguous acres* of land." AR997 (emphasis added).

On December 13, 2019, the USFS issued the five-year SUP for "emergency" feeding at Alkali Creek. AR1053-60 (Decision Memo); AR1063-75 (SUP). The USFS relied on 36 C.F.R. § 220.6(e)(3) to exempt its decision from NEPA review. AR1055. In explaining the "five contiguous acres" requirement, the USFS stated that the permit will cover "approximately 1 acre of facilities," "approximately 2 acres…for dispersed emergency spot feeding and approximately 2 acres for trailing elk from Alkali Creek to Patrol Cabin utilizing a feedline three feet wide and approximately 5.3 miles in length." AR1055. The USFS found that a five-year emergency-use permit would "allow the [WGFC] to continue to manage elk conflicts on private land in the short term while transitioning to a different strategy." AR1053. To date, the WGFC has not requested authorization for emergency feeding at Alkali Creek. AR1076-77.

## DISCUSSION

I.    Standing

Intervenors-Respondents the Hunting Coalition challenge Petitioners' standing to maintain their claims, arguing they have failed to demonstrate "injury in fact" as to Alkali Creek and "redressability" as to Dell Creek and Forest Park. Article III standing is a "threshold jurisdictional question" that a court must decide before it may consider the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-101 (1998).

To establish Article III standing, Petitioners bear the burden of demonstrating, through their members, that they have: "(1) suffered an injury in fact, (2) that is fairly

traceable to the challenged conduct of the [respondent], and (3) that it is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560 (1992).   This requirement assures that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974).

As to redressability, the Hunting Coalition argues the USFS is already conducting NEPA analysis for the operation of the Dell Creek and Forest Park feedgrounds (*see*, *e.g.*, Doc. 33, p. 2), thus an order from the Court is not likely to provide further relief.   Therefore, according to the Hunting Coalition, there is no "real need" for judicial intervention. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).   Petitioners reply that the USFS has not yet issued a scoping notice which commences the NEPA process, and any representation that it will eventually undertake NEPA review is made only in litigation and is not binding.   Further, Petitioners point out that they are independently challenging the 2017 SUPs for Dell Creek and Forest Park, and seek to vacate those authorizations for a variety of reasons including lack of NEPA review.

The Court is unpersuaded by the "redressability" arguments from the Hunting Coalition.   The USFS representations about future review under NEPA for the Dell Creek and Forest Park feedground do not fully substitute for all relief requested by Petitioners. Consequently, the Court concludes that Petitioners have adequately demonstrated redressability.

As to "injury in fact," the Hunting Coalition argues the possibility that emergency supplemental winter feeding might, someday, occur on the Alkali Creek feedground does not satisfy the requirement that a "concrete" injury in fact "must actually exist," and an "imminent" injury "must be certainly impending." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). Petitioners reply that their members have demonstrated a geographical nexus to Alkali Creek, and the requirement to demonstrate "imminence" is already satisfied because the 2019 SUP for Alkali Creek was approved without the fully informed environmental consideration that NEPA requires.

Again, the Court is unpersuaded by the Hunting Coalition's argument that Petitioners have a failed to demonstrate they have suffered a concrete injury in fact that is actual and imminent, and not conjectural or hypothetical. This Circuit recognizes that, "under [NEPA], an injury of alleged increased environmental risks due to an agency's uninformed decisionmaking may be the foundation for injury in fact under Article III." *Committee to Save the Rio Hondo v. Lucero*, 102 F.3d 445, 448-449 (10th Cir. 2005) (citation omitted). Thus, the analysis doesn't begin and end with the question of whether emergency feeding at Alkali Creek has or will occur during the term of the SUP, because it is the alleged uninformed decisionmaking and the risk to Petitioner's interests which are in focus. In short, Petitioners must show the alleged procedural failure by the USFS results in an increased risk of environmental harm, and the increased risk is to Petitioners' concrete and particularized interests. *Id*. at 449, citations omitted.

Applying this standard, Petitioners allege and argue that the USFS improperly invoked a categorical exemption to exclude from NEPA review essentially the same winter

13

feeding program at Alkali Creek which the Court vacated in *Christiansen*. Petitioners further argue this feeding program may continue for a minimum of five years, without any commitment or timeline for eliminating or phasing out artificial feeding at Alkali Creek. This Court has previously identified the increased risk of environmental harm from artificial feeding (e.g., the risk of disease transmission and the risk that the feedground will be contaminated with prions for a very long time, among other risks). Consequently, Petitioners have satisfied the requirement to show an increased risk of environmental harm from the alleged procedural failure of the USFS in applying a CE to exclude the permit approval action from further NEPA analysis.

In terms of Petitioners' concrete and particularized interests, the record contains four declarations from members with geographical proximity to the Alkali Creek feedground and concrete plans to return to the area. Doc. 42-3 – 42-6 (Harris, Ratner, Wuerthner and Osnos declarations). The declarations also discuss risks to these members' concrete and particularized interests (e.g., impact of feedgrounds to vegetation, water quality, big game and predators, and the risk of CWD infection which adversely affects: Harris' interests in observing, hunting and consuming elk given the potential for human transmission of CWD; Ratner's professional and aesthetic interest in viewing, photographing, and studying elk, as well as his ability to experience the natural beauty of a diverse and healthy ecosystem; Wuerthner's personal, professional, spiritual, scientific and aesthetic interest in the elk herds found on the BTNF – a keystone species within the Greater Yellowstone Ecosystem; and Osnos' ability to observe and enjoy elk on the

BTNF). *Id.* Considering these declarations by Petitioners' members, the Court concludes Petitioners have demonstrated an injury in fact under Article III of the U.S. Constitution.

II.   Standard for Review

Under the APA, courts "shall . . . hold unlawful and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(A), (C). An agency's decision is arbitrary and capricious if the agency (1) "entirely failed to consider an important aspect of the problem," (2) "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," (3) "failed to base its decision on consideration of the relevant factors," or (4) made "a clear error of judgment." *New Mexico ex rel. Richardson v. BLM*, 565 F.3d 683, 704 (10th Cir. 2009) (quoting *Utah Envtl. Cong. v. Troyer*, 479 F.3d 1269, 1280 (10th Cir. 2007)).

"The APA's arbitrary and capricious standard is a deferential one; administrative determinations may be set aside only for substantial procedural or substantive reasons, and the court cannot substitute its judgment for that of the agency." *Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1164 (10th Cir. 2002) (citation omitted). "A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action." *Citizens' Comm. to Save Our Canyons v. Krueger*, 513 F.3d 1169, 1176 (10th Cir. 2008) (quoting *Colo. Health Care Ass'n v. Colo. Dep't of Soc. Servs.*, 842 F.2d 1158, 1164 (10th Cir. 1988)).  Further, a deferential approach to

judicial review is particularly appropriate where the challenged decision implicates substantial agency expertise. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989) ("Because analysis of the relevant documents 'requires a high level of technical expertise,' we must defer to 'the informed discretion of the responsible federal agencies'" (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976))).

However, the presumption of validity does not shield the agency from a "thorough, probing, in-depth review." *Olenhouse v. Commodity Credit Corp*, 42 F.3d 1560, 1574 (10th Cir. 1994). Further, the "[d]etermination of whether the agency acted within the scope of its authority requires a delineation of the scope of the agency's authority and discretion, and consideration of whether on the facts, the agency action can reasonably be said to be within that range." *Id*.

III.   The feedground at Dell Creek

Petitioners advance a number of arguments relating to feeding at Dell Creek, including arguments which go toward the timeliness and sufficiency of the WGFC 2016 application which resulted in the issuance of the 2017 SUP, as well as whether a CE should properly apply to exclude further NEPA analysis. Given the jurisdictional argument advanced by the USFS, the Court will address the question of whether there is final agency action for review given 5 U.S.C. § 558(c).

The USFS argues there is no final agency action for the continued supplemental feeding at these two feedgrounds, thus Petitioners' challenge cannot proceed under the APA. In short, the USFS argues the WGFC made timely and sufficient application for a renewal or new license for feedground activities which are of a continuing nature at these

16

two locations, thus by operation of law, 5 U.S.C. § 558(c), the SUPs for Dell Creek and

Forest Park do not expire until the applications have been finally determined by the agency.

The APA states:

> When the licensee has made timely and sufficient application for a renewal
> or a new license in accordance with agency rules, a license with reference to
> an activity of a continuing nature does not expire until the application has
> been finally determined by the agency.

5 U.S.C. § 558(c).  Special use permits issued by the Forest Service are licenses within the

meaning of the APA. *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1134

(9th Cir. 2010) (applying 5 U.S.C. § 558(c) to a grazing permit, a type of Forest Service

special use permit).  Therefore, USFS special use permits continue under 5 U.S.C. § 558(c)

when a permittee makes timely and sufficient application for a renewed or new permit.

However, the record contains no application (or request) from the WGFC for a new,

renewed or amended SUP for the Dell Creek feedground prior to the expiration of SUP

BPY100217.  It is undisputed, though, that the USFS issued a letter on December 19, 2017,

advising the WGFC that its application for Dell Creek dated November 16, 2016 was

"under consideration." AR1240.  However, this letter does not explain how a 2016

application which resulted in an approved one-year SUP (BPY100217) could possibly still

be "under consideration ... pending a final decision." *Id*.

The briefing references several documents in the record as requests by the WGFC

for continued use of the feedground for the 2018 season, or requests for renewal. Doc. 62,

p. 8 (AR1203); p. 9 (AR1240); p. 29 (AR1143-47) (November 16, 2016 application to

renew Dell Creek Feedground "annually")); Doc. 63, p. 12 (AR1159).  Respondents'

briefing is unpersuasive.   The record citations to AR1203 and 1240 are to USFS documents, not to any applications or renewal requests from the WGFC.  By footnote, the USFS advances the argument or view that it "reasonably construed the [2016 WGFC application] as an annual renewal request."  Not only is this post hoc justification, but the 2016 WGFC application cannot in any way be reasonably construed as an annual renewal request.  Granted, some derivative of the word "annual" is in the 2016 application,[8] but the WGFC does not even identify the term of years needed for the feedground, or in any way suggest that this one 2016 application was intended or would be sufficient for any or all future years.

Turning next to the November 28, 2016 letter from the Wyoming Game and Fish Department (AR1159), this letter is characterized by the State of Wyoming as an expression of "interest in continuing supplemental feeding at Dell Creek." Doc. 63, p. 12. However, the letter from Ms. Flanderka simply states the Department "would like to be able to review and provide comments on the environmental analysis when the document is available for public comment." AR1159.  Contrary to how this letter is characterized by the State in briefing, it expresses absolutely no interest in applying (or any intent to apply) for a renewed or new SUP for the Dell Creek feedground.  There is no doubt that the WGFC understands the application process for requesting continued use of the Dell Creek feedground for supplemental winter feeding of elk, and yet there is no application after

---

[8] The project description references that "[a]n average of 250 elk are fed over an area of up to 35 acres annually." AR1143.  In explaining technical and financial capability, the application states that "[t]he WGFD maintains an annual budget dedicated to feedground operation and maintenance." *Id*.

2016, and that one application was acted upon in the form of a one-year SUP. Consequently, it cannot remain pending.

Finally, arguments are advanced by Respondents that 5 U.S.C. § 558(c) requires no formal application but merely a request made prior to permit expiration.  Without deciding whether this argument is correct, the Court again notes that there is no record of any request from the State to use Dell Creek for supplemental winter feeding beyond 2017.  *Cf.*, *Center for Biological Diversity v. United States Forest Service*, 2016 WL 5334474, *3-*4 (C.D.Ca. 2016) (undisputed facts identify letters from permittee to the USFS documenting its request that the permit be renewed).

Because the WGFC failed to apply for a new, renewed or amended permit for Dell Creek authorizing feeding beyond 2017, SUP BPY100217 expired on December 31, 2017 by its terms.  Therefore, 5 U.S.C. § 558(c) has no application to sanction or extend the WGFC activity of supplemental winter feeding at Dell Creek.  Consequently, the USFS letter allowing WGFC "use of NFS land for operation and maintenance of the Dell Creek … feedground[]" is ineffective as it is not in accordance with law.  AR1240.  Should the WGFC wish to use the 35-acre area of NFS land at Dell Creek for an elk feedground facility, the WGFC must make application for new authorization.

Given the Court's conclusion that SUP BPY100217 expired by its terms, all other arguments relating to the timeliness and content of the WGFC's 2016 application, and the CE invoked by the USFS, are rendered moot.

IV.     The feedground at Forest Park

As with Dell Creek, Petitioners advance a number of arguments relating to feeding at Forest Park, including arguments which challenge the issuance of the 2017 SUP and the USFS invocation of a CE to exclude further NEPA analysis.  In this instance, the WGFC applied to amend its existing authorization to use the Forest Park feedground prior to the expiration of SUP GRY10220. AR1235.

Turning first to Petitioners' arguments against the issuance of the 2017 SUP, Petitioners first argue that the USFS violated its regulations by approving a permit when there was no application for use of the Forest Park feedground by the WGFC. *See* 36 C.F.R. § 251.50(a).  Rather, the USFS issued a notice that it was considering reauthorizing feeding at Forest Park for one year in response to the WGFC's "request to continue to use the facilities on the [NFS] lands to conduct their winter elk management activities." AR1152-1153.  Petitioners also argue the 2017 SUP does not authorize a minor use considering the severity and immediacy of CWD's threat combined with a feedground's role in amplifying that threat, thus the USFS's decision to invoke a CE is improper.  Petitioners argue the USFS ignored extraordinary circumstances (wetlands and grizzly bears), and CEQ's intensity criteria which merit further analysis under NEPA .  Finally, Petitioners argue feeding at Forest Park is inconsistent with the Forest Plan's goal of restoring historic elk migration routes.

In response, the USFS argues any technical deficiencies are irrelevant as Petitioners knew that the WGFC had requested to continue a well-understood use, and they exercised their procedural right to effectively comment.  As to the NEPA argument, the USFS argues

20

its interpretation of its regulatory CE is entitled to deference and it was not clearly erroneous for the USFS to determine that a one-year renewal was a "minor" use under 36 C.F.R. § 220.6(d)(8).  The USFS also argues the record does not reveal any extraordinary circumstances or violation of the applicable Forest Plan, and the intensity criteria are inapplicable once the CE is properly invoked.

In considering Petitioners' challenges to the 2017 SUP for Forest Park, the Court finds no substantial and persuasive procedural or substantive reasons to set aside this permit.  As to the argument that the USFS violated its regulations in issuing a permit without an application, the regulatory provision relied upon by Petitioners (36 C.F.R. § 251.50(a)) prohibits individuals and entities from conducting a special use of NFS lands without a proposal and a special use authorization.  It is not a legal restriction limiting the authority of the USFS. Further, the case relied upon by Petitioners, *Greater Yellowstone Coal. v. Kimbrell*, 2007 WL 7909798 (D. Wyo. 2007), holds only that the USFS **cannot be compelled by the Court** to take action with respect to a permit in the absence of a proposal from an applicant.  This case does not conclude the USFS lacks authority to act without a proposal.

As to the argument that the USFS violated NEPA in categorically excluding the action authorized by the 2017 SUP from further analysis in an EIS or EA, the Court agrees with the USFS that its decision to invoke the CE at 36 C.F.R. 220.6(d)(8) is entitled to deference because the challenged decision implicates substantial agency expertise.  The USFS did not clearly err in finding that use of NFS land at Forest Park "has occurred for decades so the environmental impacts for a year continuation are understood." AR1203.

Nor did it clearly err in concluding that, "[s]ince these are existing facilities and the elk feeding takes place over snow only during times that natural forage is unavailable, the effects to the land are expected to be nominal." *Id*.

Further, while the risk of CWD is indeed a relevant consideration missing from discussion in the CE decision, the Court cannot substitute its judgment for that of the USFS and find that omission to be fatal to the CE decision and, therefore, to the one-year 2017 SUP authorizing a well-understood, decades-long use. Finally, the Court agrees with the USFS that the record does not reveal failure to consider extraordinary circumstances or violation of the applicable Forest Plan, and the intensity criteria are inapplicable given the conclusion that the CE is properly invoked.

Turning next to the applicability and effect of 5 U.S.C. § 558(c), Petitioners argue the WGFC 2017 application dated November 20, 2017 was not timely as the 2016 SUP advised that the permit was not renewable and that [a]pplications for a new permit must be submitted at least 6 months prior to expiration of this permit." AR1221-1222. Because of WGFC's failure to submit a timely application, Petitioners argue the 2017 SUP could not be extended under 5 U.S.C. § 558(c). Finally, Petitioners argue the 2017 SUP, "as expanded by the 2017 extension," results in a violation of NEPA and the NFMA (advancing the arguments detailed above that continued use of the feedground is not a minor use). On this point, Petitioners argue the USFS's "decision to shoehorn an indefinite renewal (that has already lasted four years) into a CE that only applies to actions lasting one year or less violates NEPA and tramples common sense, and should be set aside."

In response, the USFS argues there is no final agency action for review under the APA given that the WGFC made a timely and sufficient application to operate and maintain the Forest Park feedground (AR1235). Thus, by operation of law (5 U.S.C. § 558(c)), the SUP for Forest Park does not expire until the application has been finally determined by the agency.

The USFS is correct that neither NEPA, nor the NFMA, nor the Multiple-Use Sustained Yield Act provide Petitioners with a private right of action. Doc. 62, pp. 24-25. Petitioners claims can only proceed under the APA, which requires Petitioners identify a reviewable "final agency action." 5 U.S.C. § 704. However, Petitioners are also correct that the USFS "final agency action" argument is premised on whether 5 U.S.C. § 558(c) applies. The Court concludes this statute does apply because the WGFC "made timely and sufficient application for a renewal or a new license in accordance with agency rules" and therefore the 2017 SUP for Forest Park has not expired and there is no final agency action for review by the Court.

The Court rejects the argument that the WGFC's 2017 application was untimely. While the WGFC did not submit its application at least six months prior to the expiration of the 2017 SUP, what is significant under the APA is that the existing permit referenced by the application be "an activity of a continuing nature." 5 U.S.C. § 558(c). This condition is satisfied. Further, what is significant under the USFS regulations for non-renewable special use authorizations (as is the case here), is that the holder (WGFC) make a request *prior to the expiration of the special use authorization*. 36 C.F.C. § 251.64(b) (emphasis added). The fact that the six-month permit provision was not honored by the WGFC does

not affect the authority or discretion of the USFS to acknowledge the holder's request, nor does it invalidate a record request or application.

Because the record and law supports the conclusion that the WGFC application dated November 20, 2017 was "under consideration," the use of the Forest Creek feedground is allowed to continue by operation of 5 U.S.C. 558(c) pending a final decision by the USFS. AR1240.  The USFS acknowledgment letter to this effect (AR1240) is not a reviewable, final agency action.   Therefore, the Court lacks jurisdiction to entertain Petitioners' challenges to continued supplemental winter feeding at Forest Park under the APA.

V.      The feedground at Alkali Creek

    A.      *Was the CE properly invoked?*

Petitioners argue that the 2019 SUP authorizing supplemental feeding at Alkali Creek is not minor, does not fit within a five-acre footprint for invoking 36 C.F.R. § 220.6(e)(3), and implicates extraordinary circumstances.  They argue the five-year SUP for Alkali Creek allows feeding to occur under ambiguous conditions that mirror the same reasons the feedground was established in the first place, and that it strains credulity that the USFS could condense a 91-acre feedground into five acres.[9]  Petitioners argue it is facially implausible for emergency feeding to occur within the five-acre limitation. Petitioner also argue there is nothing "minor" about the operations authorized at Alkali Creek considering that activity to congregate hundreds of elk into a five-acre footprint

---

[9] The 2019 SUP "covers 5 acres," (AR1063), which includes approximately 1 acre of facilities, 2 acres for dispersed emergency spot feeding, and "2 acres for trailing elk from Alkali Creek to Patrol Cabin utilizing a feedline three feet wide and approximately 5.3 miles in length." AR1055.

would have "disastrous consequences". Doc. 42, p. 62.  Petitioners also argue extraordinary circumstances are present (i.e., the risk of CWD becoming established at Alkali Creek and that risk to the Grand Teton and Yellowstone National Parks as "[c]ongressionally designated areas"), and that those circumstances preclude using the CE.

The USFS responds that the 2019 SUP is an emergency use permit and not a continuation of the past status quo, as shown by the facts that (1) no feeding has occurred at Alkali Creek over the past two seasons; (2) the data show decreased numbers at Alkali Creek over the past five years (AR1597) and decreased numbers of elk congregating at the Gros Ventre feedgrounds generally. AR1076, 1597-99, 3633.  The USFS also argues, if the emergency ever occurs, the goal would be to lure elk miles east to Patrol Cabin, not to hold elk at Alkali Creek.  The USFS points to its goal being "complete cessation of feeding at Alkali Creek Feedground by or before the expiration date" (AR1054), as facilitated by the requirement that the State submit a plan for removal of existing authorized facilities by January 1, 2024. AR1060.  Finally, the USFS argues Petitioners fail to explain how trailing elk away and onto State lands would create extraordinary circumstances affecting congressionally designated areas.

36 C.F.R. 220.6(e)(3), (as it was in effect at the time of the decision),[10] provides that "[a] proposed action may be categorically excluded from further analysis and documentation in an EIS or EA only if there are no extraordinary circumstances related to the proposed action and if [the action involves] [a]pproval, modification, or continuation

---

[10] Effective November 19, 2020, the new regulation provides for an exclusion for "[a]pproval, modification, or continuation of special uses that require *less than 20 acres* of NFS lands." 36 C.F.R. § 220.6(e)(3) (emphasis added).

of minor special uses of NFS lands that require less than five contiguous acres of land. . .".

36 C.F.R. § 220.6(e)(3).

For the following reasons, the Court is persuaded by Petitioners' arguments that the CE was improperly invoked by the USFS to exclude the proposed 5-year feedground action from further NEPA analysis.   First, in considering the facts, the agency action cannot reasonably be said to involve less than five contiguous acres of land.   The Tenth Circuit affirmed a lower court decision which considered the "usual and ordinary meaning" of "adjoining" to be "contiguous or touching." *Northern Natural Gas Company v. L.D. Drilling*, 862 F.3d 1221, 1229 fn. 9 (10th Cir. 2017) (citation omitted); *see also Black's Law Dictionary* (11th Ed. 2019) ("contiguous *adj*. 1. Touching at a point or along a boundary. . . ."). There is no obvious reason to apply some different understanding to the word "contiguous" in 36 C.F.R. § 220.6(e)(3) than that suggested by its usual and ordinary meaning.

In applying the "touching" test for contiguity, the USFS map only identifies the barns, corral and route to Patrol Cabin, which constitutes approximately three of the five acres. AR1059.  The map clearly shows that these three areas of use are not contiguous. The map does not disclose the location of the additional approximately two acres needed for dispersed spot feeding.   However, it is simply implausible and unreasonable that the disclosed three noncontiguous areas could be converted into five contiguous acres by a mere two acres of ***dispersed*** emergency spot feeding.  This seems especially obvious given that the barns and corral make up two points of a triangle significantly separated from the entrance of the route to Patrol Creek, and separated by wetlands where emergency feeding

is specifically not authorized. AR1054.  On this basis alone, the CE which is expressly limited to "less than five contiguous acres" is not applicable.

Second, even if the dispersed spot feeding could be consistently managed in some fashion over the five-year period to assure a contiguous area, the Court agrees with Petitioner  that it is facially implausible for emergency feeding to occur within the five-acre limitation.   The criteria for emergency feeding includes "significant elk damage or elk/livestock co-mingling situations" and "to catch or stop a large number[11] of elk from moving down drainage from Patrol Cabin or Fish Creek elk feedgrounds." AR1063.  While the first scenario involving conflict on private land is indeed ambiguous and non-objective (as argued by Petitioners), the Court can reasonably assume either scenario would involve a large number of elk.  The Court agrees with Petitioners that it is implausible to consider that four acres[12] would suffice for dispersed feeding and trailing a large number of very large animals.[13]

The USFS argues if an emergency ever occurs, the goal would be to lure elk miles east to Patrol Cabin, not to hold elk at Alkali Creek. Doc. 62, p. 54.  While that might be the goal, it is clear that elk would be fed on an emergency basis for some undetermined period of time through dispersed feeding, otherwise, there would be no need to include two acres in the 2019 SUP for feeding.   Given the authorization for emergency feeding,

---

[11] "A large number of elk has been determined to be approximately 200 elk (which is 25% of the Alkali Feedground Objective found in the WGFD 2018-2019 Feedground report). Doc. 1063.

[12] Only four acres would be available for dispersed feeding on the feedground or spot feeding along the Gros Ventre road because approximately one acre is dedicated to facilities.

[13] Petitioners note, "[o]n average, adult elk weigh 500-700 pounds, measuring 6.5-8 feet from nose to tail." Doc. 42, p. 61 (citation omitted).  No respondent contests this fact.

triggered by hundreds of elk moving down drainage from patrol Cabin or Fish Creek elk feedgrounds, the Court concludes it is so implausible to believe these numbers could be managed on two acres of dispersed feeding, that such a conclusion cannot be ascribed to a difference in view or the product of agency expertise.[14]

The USFS also argues that Petitioners ignore the goal of "complete cessation of feeding at Alkali Creek Feedground by or before the expiration date." AR1054.  The USFS argues this goal is facilitated by the permit condition which requires, "[b]y January 1st, 2024, [the WGFC shall] provide [the USFS] with a removal plan for existing authorized facilities (one elk tagging corral, one horse corral, one tack shed, one hay stack-yard containing two haysheds, and a water facility)…". AR1060.  While this is the expressed goal, the permit allows an application for a new permit for the use and occupancy authorized by the emergency permit. AR1064.  Therefore, the Court cannot presume that this permit will be the last issued for feeding on the Alkali Creek feedground.  Also, the removal plan anticipates that USFS will allow "a reasonable period of time for completion." AR1060.  Finally, the "goal" does not change the potential for feedground use at Alkali Creek in excess of five contiguous acres.

For all these reasons, the Court concludes that the decision memo categorically excluding the authorization of emergency feeding at Alkali Creek from further NEPA

---

[14] The Court understands that the data show decreased numbers of elk at Alkali Creek and at the Gros Ventre feedgrounds generally. AR1597-99, AR3633.  However, this does not change the analysis relating to the express provisions which trigger emergency feeding.  Further, the numbers can obviously change over the five-year term of permit given the factors (winter conditions and wolves) that "can influence the number of elk counted on feedgrounds and/or fed." AR3415.  Finally, the WGFC qualify the data showing no elk were fed during the 2018-19 season with the statement that "elk spen[t] minimal time on the feedground and most feed at night, making it very difficult to get accurate counts on the feedground." AR3632.

documentation is plainly erroneous and inconsistent with the terms used in the categorical exclusion.   Given this conclusion, the Court will not address Petitioner's remaining arguments that the action is not "minor" and that it implicates "extraordinary circumstances."

B.    *What is the proper remedy for the NEPA violation?*

Intervenors-Respondents the Hunting Coalition argue the Court should not enjoin operation of the feedgrounds if the Court finds the USFS violated NEPA.  Petitioners have not sought an injunction and the injunctive balancing test is not applicable.  However, the Court understands the Hunting Coalition to be arguing remedy.  Therefore, the Court will consider the question of whether the NEPA violation relating to the Alkali Creek feedground warrants vacatur.

As Petitioners argue, vacatur is the "default" (or normal) remedy for an agency action that fails to comply with NEPA. Doc. 67, p. 46 fn. 11; *see* 5 U.S.C. § 706(2)(A) (directing reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14 (1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet statutory, procedural, or constitutional requirements.").  Nonetheless, the APA preserves the power of the courts to fashion an alternative remedy on other equitable or legal grounds. 5 U.S.C. § 702. "Nothing in the Administrative Procedure Act ... restricts the range of equitable remedies available to the Court, including the issuance of declaratory

relief without setting aside the agency action." § 702; 5 U.S.C. § 703 ; *see also* Ronald M. Levin, *"Vacation" at Sea: Judicial Remedies and Equitable Discretion in Administrative Law*, 53 Duke L.J. 291, 374–75 (2003) (discussing the importance of remand without vacation as a remedy in administrative appeals, but noting that it is a departure from the norm and urging caution in its use).

Some circuits employ a two-step test to determine whether equity counsels against vacatur, although it appears that the Tenth Circuit has not specifically addressed whether such a test applies in this circuit. *See, e.g., California Communities Against Toxics v. U.S. E.P.A.*, 688 F.3d 989, 992 (9th Cir. 2012) ("[w]hether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C.Cir.1993).

In considering the appropriate remedy for Alkali Creek, the Court concludes that vacatur simply makes no sense in the Alkali Creek feedground context. First, the Court recognizes that elk feeding in Wyoming has occurred for over 100 years and respects the USFS goal of complete cessation of feeding at Alkali Creek Feedground by or before October 1, 2024. Also, it is undisputed that the USFS has not authorized emergency feeding under the 2019 SUP since it was issued. Further, the last several years show decreased numbers of elk at Alkali Creek and at the Gros Ventre feedgrounds generally due in part to forage availability and the presence of wolves in the area. AR1597-99, AR3633. Additionally, no CWD positive cervids were documented from the October

2018-April 2019 WGFC sampling effort. AR3558.  The Court also recognizes the USFS

observation that:

> Given the scope of the issues, a remedy for Alkali will be a significant
> investment by the Forest and is problematic to complete in a timely manner
> without additional resources and expertise from WGFD or others.   In
> addition, with the recent detection of CWD and the proposal for a step down
> plan from the [National Elk Refuge], there is a question of whether the BTNF
> continues down the same path with Alkali and other feedground[s]. . . .

AR3546-47.

In short, while the USFS's error in invoking the CE is serious as a procedural matter,

substantively the action has had no documented effect on Alkali Creek.  However, a vacatur

could have significant disruptive consequences if a large number of elk were to move down

drainage from Patrol Cabin or Fish Creek feedgrounds, and the USFS and WGFC were to

lose the tools provided by the 2019 SUP – the initiation of dispersed emergency feeding

combined with spot feeding along the Gros Ventre Road to actively trail elk away from

Alkali Creek Feedgrounds to Patrol Cabin, located on state lands.  Therefore, the Court

will not vacate the 2019 SUP for Alkali Creek (JAC200235).

With this conclusion, though, the Court cautions the USFS to act in a timely manner

and invest the requisite resources in further NEPA analysis as required to either support,

amend or vacate the current 2019 SUP.

## CONCLUSION

For all the foregoing reasons, the Court **FINDS AND CONCLUDES**:

1. The one-year SUP (BPY100217) for Dell Creek feedgrounds expired by its terms notwithstanding USFS's acknowledgement to the contrary;

2. The Court AFFIRMS the one-year SUP for Forest Park (GRY100220) but lacks jurisdiction to entertain Petitioners' challenges to continued supplemental winter feeding at Forest Park pending a final decision on WGFC's application;

3. The USFS violated NEPA in authorizing the five-year SUP for the Alkali Creek feedground (JAC200235) under the categorical exclusion providing for the approval, modification, or continuation of minor special uses of NFS lands that require less than five contiguous acres of land (36 C.F.R. § 220.6(e)(3)); and

4. The USFS decision memo (AR1053) supporting the agency action to authorize the five-year SUP for the Alkali Creek feedground is REVERSED AND REMANDED for proceedings consistent with this decision.

Dated this 21st day of September, 2021.

_____
NANCY D. FREUDENTHAL
UNITED STATES DISTRICT JUDGE